# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### WESTERN DIVISION

PROGRESSIVE CASUALTY
INSURANCE COMPANY,

     Plaintiff,

vs.

FEDERAL DEPOSIT INSURANCE
CORPORATION, as Receiver of Vantus
Bank; ARLENE T. CURRY; GARY L.
EVANS; DAVID M. ROEDERE;
BARRY E. BACKHAUS; RONALD A.
JORGENSEN; CHARLES D.
TERLOUW; JON G. CLEGHORN;
ALLEN J. JOHNSON; MICHAEL W.
DOSLAND; and MICHAEL S.
MODERSKI,

     Defendants.

and

ARLENE T. CURRY; GARY L.
EVANS; DAVID M. ROEDERE;
BARRY E. BACKHAUS; RONALD A.
JORGENSEN; CHARLES D.
TERLOUW; JON G. CLEGHORN;
ALLEN J. JOHNSON; MICHAEL W.
DOSLAND; and MICHAEL S.
MODERSKI,

     Counterclaimants,

vs.

PROGRESSIVE CASUALTY
INSURANCE COMPANY,

     Counterdefendant.

No. C 12-4041-MWB

**MEMORANDUM OPINION AND
ORDER REGARDING CROSS-
MOTIONS FOR SUMMARY
JUDGMENT AND MOTION TO
STRIKE AFFIDAVIT**

# TABLE OF CONTENTS

I.    INTRODUCTION.................................................................3
    A.    Factual Synopsis ........................................................ 3
    B.    Progressive's Declaratory Judgment Action ...................... 4
    C.    The FDIC-R's Lawsuit ................................................ 5
    D.    The Pending Motions .................................................. 6

II.   PROGRESSIVE'S MOTION TO STRIKE ............................. 7
    A.    Factual Background .................................................... 7
        1.    The affiant.......................................................... 7
        2.    The challenged statements ..................................... 8
        3.    Other discovery responses .................................... 9
    B.    Arguments Of The Parties ......................................... 15
    C.    Analysis................................................................ 17
        1.    Applicable standards........................................... 17
        2.    Application of the standards ................................. 20
        3.    Summary........................................................... 22

III.  THE CROSS-MOTIONS FOR SUMMARY JUDGMENT........................ 22
    A.    Factual Background .................................................. 23
        1.    Vantus Bank and the D&O Defendants............................. 23
        2.    The Vantus Policy and the Discovery Period (Activation) ......................................... 24
        3.    Closure of Vantus Bank and the FDIC-R's claims ................ 29
    B.    Applicable Legal Standards........................................ 30
        1.    Summary judgment standards ......................................... 30
        2.    Standards for interpretation and construction of an insurance contract ......................................... 31
    C.    The Effect Of The "Insured Vs. Insured Exclusion" ..................... 36
        1.    Arguments of the parties............................................... 36
        2.    Analysis ................................................................... 39
            a.    Interpretation ................................................... 39
            b.    Construction ..................................................... 47
        3.    Summary................................................................. 50
    D.    The Effect Of The "Investment Loss Carve-Out".......................... 51
        1.    Arguments of the parties............................................... 51
        2.    Analysis ................................................................... 54
            a.    Interpretation ................................................... 54
            b.    Construction ..................................................... 61
        3.    Summary................................................................. 63

     *E.*     *The Effect Of The Dispositions Above On The D&O Defendants' Counterclaims* .................................................. 63
         *1.*     *Arguments of the parties* ............................................ 64
         *2.*     *Analysis* ................................................................ 66
         *3.*     *Summary* ............................................................... 69
*IV.*    **CONCLUSION** ........................................................... 69

## I.     INTRODUCTION

### A.     Factual Synopsis

Plaintiff Progressive Casualty Insurance Company (Progressive) filed this action, on April 25, 2012, seeking a declaration that there is no coverage under a Directors & Officers/Company Liability Insurance Policy[1] (the Vantus Policy) from Progressive for the claims asserted by the Federal Deposit Insurance Corporation, as Receiver for Vantus Bank, (FDIC-R) against the former directors and officers (D&O Defendants) of Vantus Bank in Sioux City, Iowa (Vantus Bank or Bank). Vantus Bank's Board of Directors purchased the Vantus Policy in 2006 for the period April 13, 2006, to April 13, 2009. Progressive notified Vantus Bank by letter dated February 4, 2009, that it would not renew the Vantus Policy, but in April 2009, Progressive extended the Policy Period of the Vantus Policy by 30 days to allow Vantus Bank sufficient time for deliberation on

---

[1] More specifically, the Vantus Policy at issue is Directors & Officers/Company Liability Insurance Policy For Financial Institutions Policy No. 100322780-01.

proposals for a replacement policy. Vantus Bank then purchased an extended Discovery Period (Activation) endorsement for the Vantus Policy with an effective date of May 13, 2009, and an end date of May 13, 2010. The Office of Thrift Supervision (OTS) closed Vantus Bank on September 4, 2009. On May 7, 2010, counsel for the FDIC-R sent a demand letter to the D&O Defendants, copying Progressive, demanding money damages caused by the D&O Defendants' negligence, gross negligence, and/or breaches of fiduciary duties or other wrongful acts.

### B.        *Progressive's Declaratory Judgment Action*

In this action for declaratory judgment, Progressive named as defendants the FDIC-R and the D&O Defendants. In three separate counts of its Complaint (docket no. 2), Progressive seeks declarations that three separate provisions of the Vantus Policy bar coverage for the FDIC-R's claims. I will describe those provisions as the "insured vs. insured exclusion," the "loan loss carve-out," and the "investment loss carve-out." In a fourth count, Progressive "reserved all of its rights under the Policy and applicable law."

The FDIC-R filed its Answer, Affirmative Defenses And Jury Demand (docket no. 17) in this lawsuit on June 26, 2012. On July 3, 2012, the D&O Defendants filed their Answer To Plaintiff's Original Complaint; Affirmative Defenses; Counterclaim; And Jury Demand (docket no. 19). In their Counterclaim, the D&O Defendants assert the following claims against Progressive: in Count I, a claim for breach of contract; in Count II, a claim for breach of implied warranty; and, in Count III, a claim for declaratory judgment that the Vantus Policy provides insurance coverage for the claims asserted or to be asserted by the FDIC-R against the D&O Defendants. Progressive filed its Answer And Affirmative Defenses To Defendant Directors' And Officers' Counterclaim (docket no. 25) on July 26, 2012.

### C. The FDIC-R's Lawsuit

The FDIC-R eventually filed a separate lawsuit, on May 20, 2013, against the D&O Defendants, pursuant to the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 (FIRREA), 12 U.S.C. § 1811 *et seq.*, alleging the D&O Defendants' gross negligence, negligence, and breach of fiduciary duty. *See FDIC v. Dosland*, C 13-4046-MWB (N.D. Iowa). The FDIC-R's claims are based primarily on its allegations that the D&O Defendants caused Vantus Bank to use $65 million—120 percent of its core capital—to purchase fifteen high risk collaterized debt obligations backed by Trust Preferred Securities (CDO-TruPS) without due diligence and in disregard and ignorance of regulatory guidance about the risks of and limits on purchases of such securities, resulting in losses of some $58 million. The claims ultimately made by the FDIC-R in its Complaint have limited the dispute in this declaratory judgment action by Progressive to the effect of the "insured vs. insured exclusion" and the "investment loss carve-out" in the Vantus Policy.[2]

---

[2] As United States Magistrate Judge Leonard T. Strand explained in his March 10, 2014, Order (docket no. 59), concerning discovery disputes,

> While FDIC-R's demand letter claimed that the Bank suffered losses of at least $82 million, its subsequent lawsuit against the former officers and directors asserts a claim for losses "in excess of $58 million." *See* Complaint (Doc. No. 2) in Case Number 13-cv-4046-MWB, at ¶¶ 49(h). The difference, it seems, is that FDIC-R focused its lawsuit on the Bank's investment decisions, not its loan decisions. As such, the "Loan Loss Carve Out" described in Progressive's complaint no longer appears to be at issue. Instead, the parties agree that the two Policy provisions germane to

### D. The Pending Motions

On February 27, 2014, this case was transferred to me. *See* Order (docket no. 57). This case is now before me on the following cross-motions for summary judgment: (1) the FDIC-R's September 5, 2014, Motion For Summary Judgment (docket no. 118); (2) Progressive's September 5, 2014, Motion For Summary Judgment (docket no. 120); and (3) the D&O Defendants' September 5, 2014, Motion For Summary Judgment (docket no. 125). The cross-motions for summary judgment were all duly resisted and replies in further support of them were duly filed.[3]

This case is also before me on Progressive's September 29, 2014, Motion To Strike And Exclude, In Part, The Affidavit Of Arlene Curry (Motion To Strike) (docket no. 145). The affidavit in question had been offered by the FDIC-R and the D&O Defendants as part of their Joint Appendix in support of their Motions For Summary Judgment, and they relied upon it as record evidence supporting their Joint Statement Of Undisputed Facts. On October 23, 2014, the FDIC-R filed its Opposition (docket no. 171) to Progressive's Motion To Strike and the D&O Defendants filed their Resistance (docket no. 172). Progressive filed a Reply (docket no. 181) in further support of that Motion on November 10, 2014.

---

Progressive's position that no coverage exists are the "Insured versus Insured" exclusion and the "Investment Loss Carve Out."

Order at 2.

[3] The FDIC-R also filed a Notice Of Supplemental Legal Authority In Support Of FDIC-R['s] Motion For Summary Judgment (docket no. 187), on December 18, 2014, apprising me of the December 17, 2014, decision of the Eleventh Circuit Court of Appeals in *St. Paul Mercury Ins. Co. v. FDIC*, No. 13-14228, now published at ___ F.3d ___, 2014 WL 7172472.

The movants all requested oral arguments on their Motions For Summary Judgment—in the case of the FDIC-R, by separate Motion (docket no. 123). My crowded schedule does not allow me to accommodate the parties' requests for oral arguments on the present motions in a timely manner. More importantly, I find that the parties' briefing adequately addresses all pertinent issues and that holding oral arguments on the motions would only unnecessarily increase the cost to the parties and unnecessarily delay the proceedings. Therefore, I will consider the parties' cross-motions for summary judgment, as well as Progressive's Motion To Strike, fully submitted on the parties' written submissions.[4]

Progressive's September 29, 2014, Motion To Strike concerns the record that I may properly consider on the parties' cross-motions for summary judgment. Therefore, I deem it appropriate to consider the Motion To Strike before considering the cross-motions for summary judgment.

## II.     PROGRESSIVE'S MOTION TO STRIKE
### A.     Factual Background

Progressive seeks an order striking and excluding certain paragraphs of the affidavit of Arlene T. Curry, one of the D&O Defendants, offered in support of the FDIC-R's and the D&O Defendants' Motions For Summary Judgment. Specifically, Progressive challenges paragraphs 15, 16, and 20-22 of Ms. Curry's affidavit.

### 1.     The affiant

Arlene T. Curry, a citizen of South Dakota, was a Director of Vantus Bank from 2002 until the OTS closed the Bank on September 4, 2009. Indeed, she was the Chair of the Board from October 27, 2005, to September 4, 2009. Ms. Curry is the only D&O

---

[4] Thus, the FDIC-R's September 5, 2014, separate Request For Oral Arguments On Motion For Summary Judgment (docket no. 123) is denied.

Defendant to offer an affidavit in support of or resistance to any party's Motion For Summary Judgment

### 2. *The challenged statements*

In the challenged paragraphs of her affidavit, Ms. Curry avers as follows:

> 15. Based on the email exchange and meeting with Ms. Coughlin [elsewhere identified as a representative of insurance broker Holmes Murphy & Associates], I reasonably concluded (as were all members of the Vantus Board and Mr. Moderski) that, in the absence of a regulatory exclusion, claims "brought by regulators" (including claims of the type being asserted by the FDIC-R in this case) would be covered claims under the Progressive Policy.

> 16. In addition, to my knowledge, and based on a review of documents from this period of time, no effort was made by Progressive or its agent, Holmes Murphy, to refute our understanding that, absent a regulatory exclusion, coverage would exist for "claims brought by regulators."

> &#42; &#42; &#42;

> 20. Based on all of the foregoing, I believe that at all times the Vantus Board and Mr. Moderski reasonably believed that the policy being extended would cover any and all "claims by regulators," including claims which have been asserted against them by the FDIC in *FDIC, as Receiver for Vantus Bank v. Dosland, et. a.*, N.D. Iowa Case No. 5:31-cv-04046, and which are presently pending.

> 21. To my knowledge, and based on a review of material from 2006 and 2009, at no time was it ever brought to the attention of Vantus or its directors, officers, employees, agents, or other representatives that the "insured v. insured" exclusion presently relied on by Progressive to deny coverage for the claims of the FDIC would have any effect on claims brought by the FDIC or any other regulator.

22. Finally, it was my understanding and expectation (and I believe the understanding and expectation of the Vantus Board and Mr. Moderski) that the Progressive Policy was to provide insurance coverage for any claims of wrongful conduct or alleging wrongful acts that might be asserted against Vantus officers or directors relating to management of Vanus.

Affidavit Of Arlene Curry, Defendants' Joint Appendix, Part I (docket no. 118-3), 6-7 of 647.

### 3. *Other discovery responses*

Progressive argues that these averments must be compared with the D&O Defendants' responses to certain interrogatories. Progressive points to the parts of the D&O Defendants' answer to Interrogatory No. 2 stating that "Michael Dosland . . . was the primary individual who had direct contact with Holmes Murphy representative Diane Coughlin regarding the application and purchase of D&O insurance" and that "Arlene Curry . . . had no direct contact with Holmes Murphy or Progressive other than in relation to meetings of the Board of Directors."[5] Progressive also points to part of the D&O

---

[5] Interrogatory No. 2 and the D&O Defendants' answer to it, omitting only the D&O Defendants' objections to that interrogatory, are as follows, with the language identified by Progressive italicized:

**INTERROGATORY NO. 2**: Please identify any persons involved in the Bank's application for and/or purchase of the Policy and/or the Prior Policy. Specifically, but without limitation, please identify any persons who communicated with Holmes Murphy on behalf of the Bank regarding the application for and purchase of the Policy and/or the Prior Policy and any persons who communicated with Progressive on behalf of the Bank regarding the application for and purchase of the Policy and/or the Prior

Policy. If you were involved in the Bank's application for and/or purchase of the Policy and/or the Prior Policy, please describe your involvement. If you were not involved, please so state. If you communicated with Holmes Murphy or Progressive regarding the application for and purchase of the Policy and/or the Prior Policy, please describe those communications. If you did not communicate with Holmes Murphy or Progressive, please so state.

**ANSWER**:

\* \* \*

Barry Backhaus recalls that Colin Anderson, the Bank's one-time CFO, recommended hiring Holmes Murphy to determine what insurance company to use for D&O coverage based on quality of coverage, pricing, and quality of the company itself.

Mr. Cleghorn recalls being present at two board meetings where a representative of Holmes Murphy discussed the Policy but does not recall the dates of these meetings, which are presumably reflected in the Bank's records.

*Michael Dosland* was President and CEO from January 2006 to July 2008. He *was the primary individual who had direct contact with Holmes Murphy representative Diane Coughlin regarding the application and purchase of D&O insurance* and therefore would have been involved [in] insurance applications and purchases during his tenure. However, other management personnel may have had incidental contact with Holmes Murphy. For instance, it is believed Michael Moderski also had contact with Coughlin with respect to the Policy, but Moderski was not involved regarding the application for the Prior Policy.

Defendants' answer to Interrogatory No. 3 stating that "Arlene Curry, Gary Evans, Ronald Jorgensen, Michael Moderski, David Roederer, and Charles Terlouw do not presently recall if the Bank discussed or considered any Other Policies."[6]  In addition,

---

> Mr. Dosland does not recall any specific communications or the details of such communications other than those outlined in his notes from March 21, 2006, which are being produced herein in response to Plaintiff's First Requests for Production of Documents.  Mr. Dosland does not recall having any direct communications with Progressive.

> Mr. Backhaus, Jon Cleghorn, *Arlene Curry*, Gary Evans, Ronald Jorgensen, David Roederer, and Charles Terlouw were not directly involved in the Bank's application for and/or purchase of the Policy or Prior Policy and *had no direct contact with Holmes Murphy or Progressive other than in relation to meetings of the Board of Directors*.  Additional information may be found in Mr. Evans' statement provided to the FDIC on March 7, 2011, which is incorporated herein by reference.

Declaration of Matthew J. Dendinger, Exhibit 2 (docket no. 146-3), Former D&O Defendants' Answers, With Objections, To Plaintiffs' First Interrogatories.

[6] Interrogatory No. 3 and the D&O Defendants' answer to it, omitting only the D&O Defendants' objections to that interrogatory, are as follows, with the language identified by Progressive italicized:

> **INTERROGATORY NO. 3**:  Please identify any Other Policies the Bank applied for or considered or discussed applying for at or around the time it applied for the Policy and the Prior Policy.  If you were involved in the Bank's consideration or discussion of Other Policies, please describe your involvement.  If you were not involved, please so state.

Progressive characterizes the D&O Defendants' answer to Interrogatory No. 4 as indicating that "several Board members, including Michael Moderski and Michael

---

**ANSWER**:

\* \* \*

Barry Backhaus recalls that Colin Anderson, the Bank's one-time CFO, recommended hiring Holmes Murphy to determine which insurance company to use for D&O coverage based on quality of coverage, pricing, and quality of the company itself.

Jon Cleghorn believes that Holmes Murphy presented bids from other companies, but his only involvement was at the board level. He does not specifically recall any Other Policies discussed.

Michael Dosland would have been involved at some level in the consideration of Other Policies. However, he has no recollection of the timing, nature, extent, or details of such involvement other than he would have also spoken with Mills Shelhammer Puetz Agency and Cincinnati Insurance in early 2006 to get competing bids. He does not remember the details of those communications.

*Arlene Curry, Gary Evans, Ronald Jorgensen, Michael Moderski, David Roederer, and Charles Terlouw do not presently recall if the Bank discussed or considered any Other Policies.* Additional information may be found in Mr. Evans' statement provided to the FDIC on March 7, 2011, and Mr. Moderski's statement provided to the FDIC on March 30, 2011, which are incorporated herein by reference.

Declaration of Matthew J. Dendinger, Exhibit 2 (docket no. 146-3), Former D&O Defendants' Answers, With Objections, To Plaintiffs' First Interrogatories.

Dosland, have no recollection of conversations regarding the Policy's coverage of particular claims, such as those asserted by the FDIC-R against the Board members." Progressive Memorandum In Support Of Motion To Strike (docket no. 146), 5.[7]

---

[7] Interrogatory No. 4, and the D&O Defendants' complete answer to it, omitting only their objections, are as follows:

**INTERROGATORY NO. 4**:  Please describe any communications you had with any person(s) prior to September 4, 2009 regarding how the Policy or Prior Policy would respond to claims such as those asserted by the FDIC-R in the Receiver's Claim and whether the Policy or Prior Policy would provide coverage for such claims.  Please also specify the dates of all such communications and identify all persons with whom you had such communications.  If you had no such communications, please so state.

**ANSWER**:

* * *

It is impossible for the Former D&Os to state with certainty all communications that have occurred and in what form. Each will testify that, based on representations and warranties made by Progressive in its Marketing Materials and by representatives of Holmes Murphy during meetings of the Board of Directors, the Former D&O's individual and collective understanding was that the coverage to be provided by Progressive would be adequate for the needs of the Board and available in the circumstances underlying the Receiver's Claim or any similar claim. They will further testify that they reasonably believed that the coverage advertised to them was in fact adequate for their needs, and would be available for all of the claims that have been asserted by the FDIC.

Jon Cleghorn recalls board meetings prior to September 4, 2009, at which representatives of Holmes Murphy discussed coverage. He does not recall the specifics of these meetings, but left them with the understanding described above.

Arlene Curry had contact with Diana Coughlin at Holmes Murphy at the time the Policy was up for renewal in 2009. She does not recall the specifics of the conversations, but they generally covered the ability to purchase "tail" coverage from Progressive and, according to Ms. Coughlin, the Policy with tail coverage did not have a regulatory exclusion.

Michael Dosland would have had communications with Ms. Coughlin outside of Board of Director meetings, but he does not recall specific communications.

Any discussions Michael Moderski had about the Policy would have been with the Holmes Murphy agent, members of the executive management team, and the Board. He has no recollection of specific conversations as to how the Policy or Prior Policy would respond to claims and whether the Policy or Prior Policy would provide coverage for such claims.

Charles Terlouw recalls discussions at the board level regarding the coverage the Policy would provide. He does not recall any specific discussions regarding whether the Prior Policy would provide coverage.

Barry Backhaus, Gary Evans, Ronald Jorgensen, and David Roederer do not presently recall having any specific communications regarding the Policy or Prior Policy other than those occurring in relation to meetings of the Board of Directors. Additional information may be found in

## B.    *Arguments Of The Parties*

In support of its Motion To Strike, Progressive contends that Ms. Curry relies solely on the minutes of several Vantus Board meetings and correspondence with Holmes Murphy, the insurance broker, to support her averments about what all members of the Board and Mr. Moderski "reasonably believed" or "reasonably concluded." Progressive argues, however, that none of the minutes or correspondence contain any discussion of the coverage provided by the Vantus Policy.  Thus, Progressive contends that Ms. Curry's affidavit fails to set forth facts demonstrating her personal knowledge, so that it does not meet the admissibility requirements of Rule 56(c)(4) of the Federal Rules of Civil Procedure.  Indeed, Progressive argues that it is unclear how one can determine from the records cited by Ms. Curry what the beliefs of any, let alone every, member of the Board might be regarding coverage under the Vantus Policy, where there is no indication in those records that the Board or the insurance broker discussed that issue. Progressive contends that simply attributing statements to Ms. Curry's "information and belief" is also inadequate.  Progressive argues that, because Ms. Curry has no personal knowledge, the challenged parts of her affidavit must rely on inadmissible hearsay. Progressive argues that there is no exception for the hearsay in question, because the "state of mind" exception in Rule 803(3) of the Federal Rules of Evidence does not exempt statements of memory or belief to prove the fact remembered or believed, *i.e.*, that the Policy did provide coverage consistent with Ms. Curry's and other D&O Defendants' alleged understanding.  Finally, Progressive argues that Ms. Curry lacks any

Mr. Evans' statement provided to the FDIC on March 7, 2011, which is incorporated herein by reference.

Declaration of Matthew J. Dendinger, Exhibit 2 (docket no. 146-3), Former D&O Defendants' Answers, With Objections, To Plaintiffs' First Interrogatories.

personal knowledge of Progressive's attempts to inform Board members of the "insured vs. insured exclusion." Progressive argues that one cannot simply equate absence of information with personal knowledge.

The FDIC-R and the D&O Defendants counter that there is sufficient indication of the factual basis for Ms. Curry's challenged averments from her statements about her service on the Board, participation in its meetings, and review of pertinent business documents. The FDIC-R and the D&O Defendants point out that an affiant's conclusions may be based on personal observations and review of business records in the affiant's official capacity. They then argue that Ms. Curry's review of materials provided by Progressive prior to the March 23, 2006, meeting at which the Board approved the purchase of the Vantus Policy, which Ms. Curry states provided part of the basis for her averments, included documents setting out precisely the matters to which Ms. Curry avers. They also argue that the minutes of Board meetings do adequately indicate discussions of pertinent issues to support Ms. Curry's personal knowledge of the matters to which she avers.

The FDIC-R and the D&O Defendants also argue that Ms. Curry's averments about the shared beliefs and expectations of the Board members are based on specific representations that Progressive made to the entire Board regarding the purchase of the Vantus Policy in 2006 and the extended Discovery Period coverage in 2009. The FDIC-R also argues that portions of interrogatory answers *not* cited by Progressive also support such shared beliefs and expectations. The FDIC-R contends that, because Ms. Curry was involved in pertinent Board meetings, she has not based her challenged averments simply on inadmissible hearsay. Similarly, the D&O Defendants argue that Ms. Curry was in a position to know and understand the circumstances and to observe the relations of the parties. The FDIC-R argues that Rule 803(3) makes admissible statements such as those challenged by Progressive regarding the expectations of Ms. Curry's fellow

16

board members, because those statements are indicative of Ms. Curry's and the other D&O Defendants' then-existing state of mind. The FDIC-R argues that the matter for which the statements are offered is precisely to show Ms. Curry's and the other D&O Defendants' state of mind or understanding regarding coverage, not to prove that the Vantus Policy did actually provide the coverage that Ms. Curry and the other D&O Defendants expected. Similarly, the D&O Defendants argue that an affiant may properly state what the affiant believed another's state of mind was, based on the affiant's observations of the other's statements or conduct. As to Ms. Curry's averments concerning the "insured vs. insured exclusion," the FDIC-R and the D&O Defendants argue that Ms. Curry did have personal knowledge about what statements Progressive did *not* make, as well as what statements Progressive *did* make, and did not simply rely "upon information and belief."

In reply, Progressive argues that the sources of information cited by Ms. Curry for the challenged averments do not demonstrate a factual basis for her specific averments, because they do not indicate any discussion or mention of the matters to which Ms. Curry avers. Progressive also argues that "to my knowledge" is not a magic phrase that demonstrates personal knowledge for any and every fact stated. Because the challenged averments are not based on personal knowledge, Progressive argues that they must be based on inadmissible hearsay about the beliefs of others offered to prove the fact believed, *i.e.*, that the Policy provides coverage for the FDIC-R's claims.

## C.     Analysis

### 1.     Applicable standards

The Eighth Circuit Court of Appeals "review[s] the admission of evidence for consideration at the summary judgment stage for an abuse of discretion." *Gannon Int'l, Ltd. v. Blocker*, 684 F.3d 785, 793 (8th Cir. 2012) (citing *Warner Bros. Entm't, Inc. v.*

*X One X Prods.*, 644 F.3d 584, 591 (8th Cir. 2011)). Rule 56(c)(2) provides, "A party may object that the material cited to support or dispute a fact [at the summary judgment stage] cannot be presented in a form that would be admissible in evidence." FED. R. CIV. P. 56(c)(2). When an objection is made to evidence relied on at summary judgment, "the burden is on the proponent of the evidence to show that the material is admissible as presented or to explain the admissible form that is anticipated." *Gannon Int'l, Ltd.*, 684 F.3d at 793 (citing FED. R. CIV. P. 56, advisory committee's note).

Rule 56(c)(4) provides, "An affidavit or declaration used to support or oppose a motion [for summary judgment] must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." FED. R. CIV. P. 56(c)(4). Thus, "'[w]hen an affidavit *contains* an out-of-court statement offered to prove the truth of the statement that is inadmissible hearsay, the statement may not be used to support or defeat a motion for summary judgment.'" *Jenkins v. Winter*, 540 F.3d 742, 747 (8th Cir. 2008) (emphasis added) (quoting *Brooks v. Tri-Systems, Inc.*, 425 F.3d 1109, 1111 (8th Cir. 2005)). Similarly, statements in an affidavit *based on* what the affiant "learned" or "heard" about a decision or a decision-making process are hearsay and do not satisfy the "personal knowledge" requirement. *Ward v. International Paper Co.*, 509 F.3d 457, 462 (8th Cir. 2007).

In contrast, statements in an affidavit that are the affiant's own and based on his or her own personal knowledge may be considered on summary judgment. *Jenkins*, 425 F.3d at 1111; FED. R. CIV. P. 56(c)(4). The Eighth Circuit Court of Appeals has held that an affiant "certainly" possesses "personal knowledge" of his or her own reasons for making a particular decision. *Brannon v. Luco Mop Co.*, 521 F.3d 843, 847-48 (8th Cir. 2008); *Aucutt v. Six Flags Over Mid-Am., Inc.*, 85 F.3d 1311, 1317 (8th Cir. 1996). Also, an affidavit is admissible if it states the affiant's personal knowledge or perception

acquired through review of records prepared in the ordinary course of business. *See Eckelkamp v. Beste*, 315 F.3d 863, 872 (8th Cir. 2002) (citing *Burlington N. R.R. Co. v. Nebraska*, 802 F.2d 994, 1004 (8th Cir. 1986)).

In addition, I have explained,

> "[A]ffidavits asserting personal knowledge must include enough factual support to show that the affiant possesses that knowledge." *El Deeb v. University of Minn.*, 60 F.3d 423, 428 (8th Cir.1995). An affirmation on "information and belief is insufficient." *Camfield Tires, Inc. v. Michelin Tire Corp.*, 719 F.2d 1361, 1367 (8th Cir.1983).

*Guinan v. Boehringer Ingelheim Vetmedica, Inc.*, 803 F. Supp. 2d 984, 992 (N.D. Iowa 2011) (quoting *Helm Fin. Corp. v. Iowa N. Ry. Co.*, 214 F. Supp. 2d 934, 953 (N.D. Iowa 2002)). Thus, "[t]he test for admissibility is whether a reasonable trier of fact could believe the witness had personal knowledge." *Id.*

I have also recognized that the "personal knowledge" requirement does not necessarily make an affiant's opinion about the state of mind of another, even such an opinion in conclusory terms, inadmissible for summary judgment purposes. *See Marsh v. Hog Slat, Inc.*, 79 F. Supp. 2d 1068, 1074 (N.D. Iowa 2000) (citing *Kehoe v. Anheuser-Busch, Inc.*, 995 F.2d 117, 119 n.3 (8th Cir. 1993)). Rather, "'[i]f the affiant[ ] ha[d] 'personal knowledge,' FED. R. CIV. P. 56(3) [now FED. R. CIV. P. 56(c)(4)], there is no reason why [he or she] should not be permitted to summarize [his or her] impressions'" about another person's state of mind. *Id.* (quoting *Kehoe*, 995 F.3d at 119 n.3). Consequently, "[t]he question is not whether the affidavit states the affiant's opinion about another's state of mind, but whether the affiant had 'personal knowledge' of the matters about which the affiant made the statement," based, for example, on the affiant's opportunity to have observed the person whose state of mind

the affiant describes. *Id.* (citing *Kehoe*, 995 F.2d at 119 n.3, and then-FED. R. CIV. P. 56(e), now FED. R. CIV. P. 56(c)(4)).

Finally, purported inconsistencies between statements in an affidavit and other discovery responses do not make the affidavit inadmissible at summary judgment, if the affidavit appears to clarify and not contradict the prior discovery responses. *See Brannon*, 521 F.3d at 847.

### 2. *Application of the standards*

Progressive's Motion To Strike appears to rely, in the first instance, on alleged inconsistencies between Ms. Curry's challenged averments and the D&O Defendants' responses to certain interrogatories. When the responses to the interrogatories are viewed in full, however—as they are set forth in the margins, above—it is readily apparent that the affidavit clarifies, but does not contradict, the basis for Ms. Curry's knowledge of the process that the Vantus Board went through in selecting the Vantus Policy. Thus, those interrogatory responses do not make the challenged averments inadmissible at summary judgment. *See Brannon*, 521 F.3d at 847. Indeed, as the FDIC-R and the D&O Defendants argue, a review of the interrogatory responses in conjunction with Ms. Curry's affidavit, read as a whole, would lead a reasonable trier of fact to believe that Ms. Curry had personal knowledge of the matters to which she avers in the challenged paragraphs of her affidavit. *See Guinan*, 803 F. Supp. 2d at 992 (stating this as the test for admissibility of an affidavit at summary judgment).

As to the challenged statements of Ms. Curry's own beliefs regarding what the Vantus Policy would cover and her reasons for approving that Policy, Ms. Curry "certainly" possessed "personal knowledge." *See Brannon*, 521 F.3d at 847-48; *Jenkins*, 423 F.3d at 1111; *Aucutt*, 85 F.3d at 1317; FED. R. CIV. P. 56(c)(4). The affidavit properly avers that Ms. Curry acquired such "personal knowledge," *inter alia*, from her review of records prepared in the ordinary course of business at the pertinent times—

before selecting the Vantus Policy in 2006 and before obtaining the Discovery Period coverage in 2009. *See Eckelkamp*, 315 F.3d at 872. Contrary to Progressive's assertions, the fact that specific minutes of Board meetings and some documents do not reflect discussion of the specific matters to which Ms. Curry avers does *not* demonstrate that there is no adequate factual basis for her averments. Although affidavits must include enough factual support that the affiant possessed personal knowledge, *see Guinan*, 803 F. Supp. 2d at 992 (citing *El Deeb*, 60 F.3d at 428), the FDIC-R and the D&O Defendants have pointed to documents that Ms. Curry states that she reviewed that demonstrate a factual basis for her understanding of the coverage under the Vantus Policy and the Discovery Period extension. Indeed, it is ridiculous to imagine that minutes of a Board meeting would necessarily detail each and every issue discussed by the Board members. More importantly, a review of the documents, cited by the FDIC-R and the D&O Defendants, which were provided to the Board before making the decisions in question, and Ms. Curry's involvement in the decision-making process would lead a reasonable trier of fact to believe that Ms. Curry had personal knowledge of the matters to which she avers in the challenged paragraphs of her affidavit. *See id.* (stating this as the test for admissibility of an affidavit at summary judgment).

Nor do I find Ms. Curry's averments about the state of mind or beliefs of other D&O Defendants to be inadmissible at summary judgment. Such averments are not necessarily inadmissible. *See Marsh*, 79 F. Supp. 2d at 1074 (citing *Kehoe*, 995 F.2d at 119 n.3). Here, Ms. Curry plainly participated in the decision-making process with the other D&O Defendants and had more than adequate opportunity to observe their statements and conduct and the statements and conduct of the insurance broker's representative. Her participation and observations are sufficient to give her "personal knowledge" of the beliefs and understanding of the other D&O Defendants and the reasons for their decisions at the time of those decisions. *See id.* Again, Ms. Curry's

involvement in the decision-making process and the pertinent meetings would lead a reasonable trier of fact to believe that Ms. Curry had personal knowledge of the beliefs, understanding, and reasoning of the other D&O Defendants at the pertinent times. *See id.* (stating this as the test for admissibility of an affidavit at summary judgment).

Finally, Progressive's "hearsay" objection is unavailing. First, Ms. Curry does not aver to what she merely "learned" or "heard" about the decisions of others, *compare Ward*, 509 F.3d at 462, nor are her averments based merely on "information and belief." *See Guinan*, 803 F. Supp. 2d at 992 (averments based on "information and belief" are inadequate to demonstrate "personal knowledge"). Rather, Ms. Curry states her *own* state of mind at the time and her summary of her impressions of the state of mind of the other D&O Defendants at the time. *See Marsh*, 79 F. Supp. 2d at 1074 (citing *Kehoe*, 995 F.2d at 119 n.3). Also, Progressive's arguments concerning the applicability of Rule 803(3) are wrong-headed, not least because it appears to me that the FDIC-R and the D&O Defendants have not offered Ms. Curry's statements of the state of mind of others to prove that the Vantus Policy provides coverage for the FDIC-R's claims. Rather, they have offered those statements to prove the D&O Defendants' expectations and beliefs about coverage, which falls squarely within the Rule 803(3) exception.

### *3.    Summary*

In short, Progressive's September 29, 2014, Motion To Strike is denied in its entirety. Consequently, I may consider Ms. Curry's affidavit, in its entirety, in my analysis of the parties' cross-motions for summary judgment.

## III.    THE CROSS-MOTIONS FOR SUMMARY JUDGMENT

In their cross-motions for summary judgment, the parties contest the applicability of two provisions of the Vantus Policy, the "insured vs. insured exclusion" and the

"investment loss carve-out." Progressive also asserts that resolution of these two issues, as well as other undisputed facts or matters of law, require summary judgment in its favor on the D&O Defendants' counterclaims. I will consider these distinct issues in turn. First, however, I will survey the nucleus of facts necessary to put in context the parties' arguments, then summarize the standards applicable to a motion for summary judgment and the standards, under Iowa law, for interpreting and construing an insurance contract.

## A.    *Factual Background*

I find that a much more circumscribed statement of facts—disputed and undisputed—than the parties have offered is sufficient to put in context the parties' arguments concerning their cross-motions for summary judgment. Indeed, I find that the nucleus of facts most relevant to disposition of the cross-motions for summary judgment involves little more than the pertinent terms of the Vantus Policy and the nature of the claims in the related lawsuit by the FDIC-R against the D&O Defendants, *FDIC v. Dosland*, C 13-4046-MWB (N.D. Iowa). Unless I indicate otherwise, the facts set out here are undisputed.

### 1.    *Vantus Bank and the D&O Defendants*

Although the fact is not set out in any parties' statement of undisputed facts, it appears from the record that no party would dispute that Vantus Bank was a federal savings bank with its home office in Sioux City, Iowa, and that it was, at one time, known as First Federal Bank. It also appears from the record that no party would dispute that Michael Dosland, now a citizen of Wisconsin, was Vantus Bank's Chief Executive Officer and President, as well as a member of the Board of Directors, from January 2006 until he resigned in July 2008; Michael S. Moderski, also now a citizen of Wisconsin, was the Bank's Chief Financial Officer and Controller from April 2006 until the Office of Thrift Supervision (OTS) closed Vantus Bank on September 4, 2009; Barry E.

Backhaus, a citizen of Iowa, was a Director from 1987 until the OTS closed the Bank, and the Bank's Interim President from July 2008 to December 2008; Arlene T. Curry, a citizen of South Dakota, was a Director from 2002 until the OTS closed the Bank; Gary L. Evans, a citizen of Iowa, was a Director from 1989 until the OTS closed the Bank; Ronald A. Jorgenson, a citizen of Iowa, was a Director from July 2005 until the OTS closed the Bank; Jon C. Cleghorn, a citizen of South Dakota, was a Director from 1998 until the OTS closed the Bank; and Charles D. Terlouw, a citizen of Iowa, was a Director from July 2006 until the OTS closed the Bank. These are the individuals described herein as the D&O Defendants.

### 2. *The Vantus Policy and the Discovery Period (Activation)*

As stated at the outset of this decision, Vantus Bank's Board of Directors purchased Directors & Officers/Company Liability Insurance Policy For Financial Institutions Policy No. 100322780-01 (the Vantus Policy) from Progressive in 2006 for the period April 13, 2006, to April 13, 2009. The Vantus Policy was created by Progressive. In quoted portions of the Vantus Policy, terms in bold in the original indicated that those terms were defined in the Policy.

There does not appear to be any dispute that, as used in the Vantus Policy, **Insurer** means Progressive and that **Insured Persons** include the D&O Defendants. *See* Vantus Policy, § IV(A) and (E), Defendants' Joint Appendix II, 207-208. There also does not appear to be any dispute that **Company** includes Vantus Bank. Nevertheless, the definitions of **Company** in the Vantus Policy and in the subsequent Discovery Period (Activation) endorsement may be at issue in this case, so I will set forth those definitions here. First, the Vantus Policy defines **Company** as follows:

> **Company** means the entity or entities set forth in Item 1 of the Declarations, any **Subsidiary** created or acquired as of the inception date set forth in Item 2 of the Declarations, and,

> subject to Section XII(B), any bank **Subsidiary** created or
> acquired during the **Policy Period**.

Vantus Policy, § IV(E), Defendants' Joint Appendix II at 207. Item 1 of the Declarations lists the following entities: Vantus Bank, First Federal Bankshares, Inc., First Federal Bank, First Financial Corporation of Sioux City, Sioux Financial Company, United Escrow, Inc., Equity Services, Inc., Sioux Abstract Company, and Rerick Abstract Company. Vantus Policy, Amendment To Declarations (effective 09/04/2007), Defendants' Joint Appendix II at 204. The Discovery Period (Activation) endorsement expressly replaces the definition of **Company** above with the following definition:

> **Company**, means the entity or entities set forth in Item 1 of
> the Declarations, any **Subsidiary** created or acquired as of the
> inception date set forth in Item 2 of the Declarations, and the
> acquiring entity, but only for **Wrongful Acts** involving the
> entity or entities set forth in Item 1 of the Declarations and
> only for **Wrongful Acts** occurring prior to the termination
> date of this **Policy**.

Vantus Policy, Discovery Period Activation, Amendment to § IV(E), Defendants' Joint Appendix at 198. Item 1 of the Declarations Page for the Discovery Period (Activation) endorsement lists the identical entities as the original Vantus Policy, although "Vantus Bank" has been handwritten into the list. Vantus Policy, Discovery Activation, Declarations Page, Item 1, Defendants' Appendix II at 200.

The Vantus Policy provides for Insured Persons Liability Coverage as follows:

> The **Insurer** will pay on behalf of the **Insured Persons, Loss**
> resulting from **Claims** first made during the **Policy Period** or
> the Discovery Period against the **Insured Persons** for which
> the **Insured Persons** are legally obligated to pay for
> **Wrongful Acts**, except for **Loss** the **Company** pays as
> indemnification.

*See* Vantus Policy, § I(A), Defendants' Joint Appendix II at 205.

**Claim** is defined in the Vantus Policy, in pertinent part, as follows:

> **Claim**, either in singular or plural, means any of the following instituted against an **Insured Person** or against the **Company**, but only to the extent coverage is granted to the **Company:**
>
> (1)      a written or oral demand for monetary damages or non-monetary relief;
>
> (2)      a civil proceeding commenced by the service of a complaint or similar pleading;
>
> * * *
>
> for a **Wrongful Act** including any appeal from such proceeding.

Vantus Policy, § IV(C)(1) and (2), Defendants' Joint Appendix II at 207. There does not appear to be any dispute that the FDIC-R's claims, as asserted in the Demand Letter and the separate lawsuit, as described below, are **Claims** within the meaning of the Vantus Policy. Of course, that does not mean that there is necessarily coverage under the Vantus Policy for such **Claims**.

**Wrongful Act** is defined in the Vantus Policy, as follows:

> **Wrongful Act**, either in singular or plural, means any actual or alleged act, error, omission, misstatement, misleading statement, neglect or breach of duty by:
>
> (1)      any **Insured Person** in the discharge of their duties while acting solely in the capacity as such or while acting solely in the capacity as director, officer, or member of the board of trustees of a not-for-profit entity pursuant to Section II(B);
>
> (2)      any **Insured Person** in the discharge of their duties while acting solely in the capacity as administrator, custodian or trustee under any individual retirement account (IRA) or H.R. 10 Plan (Keogh Plan) outside

of the scope of any Trust Department or Trust **Subsidiary** of the **Company**; or

(3) the **Company** or any person or entity for which the **Company** is legally responsible, but only to the extent that coverage is granted to the **Company** by Insuring Agreement made a part of this **Policy**.

Vantus Policy, § IV(X), Defendants' Joint Appendix II at 210.

The definition of **Loss** under the Vantus Policy is critical in this case, because it includes, as subsection (6), the "investment loss carve-out," which Progressive asserts is a bar to coverage for the FDIC-R's claims against the D&O Defendants. The definition of **Loss**, in pertinent part, is as follows:

**Loss** means **Defense Costs** and any amount which the **Insured Persons** or the **Company** (if applicable) are legally obligated to pay resulting from a **Claim**, including damages, judgments, settlements, pre- and post-judgment interest, punitive or exemplary damages and the multiple portion or any multiplied damage award where insurable by law. **Loss** shall not include:

* * *

(6) the depreciation (or failure to appreciate) in value of any investment product, including securities, commodities, currencies, options or futures due to market fluctuation unrelated to any **Wrongful Act**[.]

Vantus Policy, § IV(N)(6), Defendants' Joint Appendix II at 209.

In addition to the definition and limitation on **Loss**, the Vantus Policy also includes the following "insured vs. insured exclusion," which Progressive also argues bars coverage for the FDIC-R's claims against the D&O Defendants:

**Insured vs. Insured Exclusion** – The **Insurer** shall not be liable to make any payment for **Loss** in connection with any **Claim** by, on behalf of, or at the behest of the **Company**, any

27

affiliate of the **Company** or any **Insured Person** in any capacity except where such **Claim** is brought and maintained:

(1)      in the form of a cross-claim or third-party claim for contribution or indemnity which is part of and results directly from a **Claim** which is not otherwise excluded by the terms of the **Policy**;

(2)      by an **Insured Person** solely as a customer of the **Company**; provided such **Claim** is brought independently of, and totally without the solicitation, assistance, participation, or intervention of any other **Insured**; or

(3)      by a security holder of the **Company** as a derivative action on behalf of the **Company** or such affiliate; provided such **Claim** is brought independently of, and totally without the solicitation, assistance, participation, or intervention of any **Insured** of any affiliate of the **Company**.

Vantus Policy, § V(J), Defendants' Joint Appendix II at 212.

There is no dispute that the Vantus Policy does *not* include any provision expressly identified as an exclusion of coverage for "regulatory" claims or any provision that expressly excludes "regulatory" claims, such as claims by the FDIC-R, as sometimes appear in comparable director and officer liability policies from Progressive and other insurers.

Progressive notified Vantus Bank by letter dated February 4, 2009, that it would not renew the Vantus Policy. In April 2009, however, Progressive extended the Policy Period of the Vantus Policy by 30 days to allow Vantus Bank sufficient time for deliberation on proposals for a replacement policy. Vantus Bank then purchased an extended Discovery Period (Activation) endorsement for the Vantus Policy with an effective date of May 13, 2009, and an end date of May 13, 2010. The extended

Discovery Period (Activation) endorsement extended the original Policy's termination date, but it expressly applied only to specified coverages, including Directors And Officers Liability and Fiduciary Liability, during the effective period. Vantus Policy, Discovery Period (Activation), ¶¶ 1-2, Defendants' Joint Appendix II at 198.

### 3. Closure of Vantus Bank and the FDIC-R's claims

On September 4, 2009, during the extended Discovery Period for the Vantus Policy, the OTS closed Vantus Bank and appointed the FDIC-R as Receiver. On May 7, 2010, also during the extended Discovery Period for the Vantus Policy, counsel for the FDIC-R sent a letter (the Demand Letter) via certified and overnight mail to the D&O Defendants, copying Progressive, demanding money damages caused by the D&O Defendants' negligence, gross negligence, and/or breaches of fiduciary duties or other wrongful acts. Progressive has not disputed that the FDIC-R's Demand Letter asserted **Claims** within the meaning of the Vantus Policy against the D&O Defendants prior to the expiration of the Vantus Policy's extended Discovery Period.

As explained above, the FDIC-R eventually filed a separate lawsuit, on May 20, 2013, against the D&O Defendants, pursuant to the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 (FIRREA), 12 U.S.C. § 1811 *et seq. See FDIC v. Dosland*, C 13-4046-MWB (N.D. Iowa). In that lawsuit, the FDIC-R asserts claims against the D&O Defendants for their gross negligence, negligence, and breach of fiduciary duty. Progressive has not asserted that these claims are inconsistent with claims in the Demand Letter, although, as explained above, at page 5 and note 2, the claims in the lawsuit are narrower than the claims in the Demand Letter as to the wrongful conduct in question. Somewhat more specifically, the FDIC-R's claims in its lawsuit are based primarily on its allegations that the D&O Defendants caused Vantus Bank to use $65 million—120 percent of its core capital—to purchase fifteen high risk collaterized debt obligations backed by Trust Preferred Securities (CDO-TruPS) without due diligence and

in disregard and ignorance of regulatory guidance about the risks of and limits on purchases of such securities, resulting in losses totaling some $58 million. The FDIC-R's claims do not allege wrongdoing concerning loans. Progressive contends that the claims by the FDIC-R in its lawsuit fall outside of the coverage provided by the Vantus Policy, but only on the basis of the "insured vs. insured exclusion" and the "investment loss carve-out."

## B.    Applicable Legal Standards

### 1.    Summary judgment standards

Summary judgment is only appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c) (emphasis added); *see Woods v. DaimlerChrysler Corp.*, 409 F.3d 984, 990 (8th Cir. 2005) ("Summary judgment is appropriate if viewing the record in the light most favorable to the nonmoving party, there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law."); *see generally Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). Thus, "[t]he movant 'bears the initial responsibility of informing the district court of the basis for its motion,' and must identify 'those portions of [the record] . . . which it believes demonstrate the absence of a genuine issue of material fact.'" *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc) (quoting *Celotex*, 477 U.S. at 323). In response, "[t]he nonmovant 'must do more than simply show that there is some metaphysical doubt as to the material facts,' and must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Id.* (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)).

When the parties have met their burden, the district judge's task is as follows:

"On a motion for summary judgment, 'facts must be viewed in the light most favorable to the nonmoving party only if there is a genuine dispute as to those facts.'" *Ricci v. DeStefano*, ---U.S. ----, 129 S. Ct. 2658, 2677, 174 L. Ed. 2d 490 (2009) quoting *Scott v. Harris*, 550 U.S. 372, 380, 127 S. Ct. 1769, 167 L. Ed. 2d 686 (2007) (internal quotations omitted). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000), quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). . . . . "'Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.'" *Ricci*, 129 S. Ct. at 2677, quoting *Matsushita*, 475 U.S. at 587, 106 S. Ct. 1348.

*Torgerson*, 643 F.3d at 1042-43.

"Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Ryan v. Capital Contractors, Inc.*, 679 F.3d 772, 776 (8th Cir. 2012). However, summary judgment is particularly appropriate when only questions of law are involved, rather than factual issues that may or may not be subject to genuine dispute. *See, e.g., Cremona v. R.S. Bacon Veneer Co.*, 433 F.3d 617, 620 (8th Cir. 2006).

## 2. *Standards for interpretation and construction of an insurance contract*

As mentioned just above, summary judgment must be determined in light of the "governing law." *See, e.g., Anderson*, 477 U.S. at 248. The "governing law" here necessarily relates to the interpretation and construction of an insurance contract. Notwithstanding references by the parties to decisions outside of this state and federal

circuit, there does not appear to be any dispute that Iowa law governs my interpretation and construction of the Vantus Policy.

The most recent comprehensive discussion of insurance policy interpretation and construction under Iowa law is set out in *Boelman v. Grinnell Mutual Reinsurance Company*, 826 N.W.2d 494 (Iowa 2013). In *Boelman*, the Iowa Supreme Court observed, first, that there are "differences between interpretation and construction of an insurance policy." 826 N.W.2d at 501. Specifically, "[i]nterpretation requires [the court] to give meaning to contractual words in the policy." *Id.*; *see also Hagenow v. America Family Mut. Ins. Co.*, 846 N.W.2d 373, 376 (Iowa 2014) (describing "interpretation" of an insurance policy as the court's "fundamental task"); *Osmic v. Nationwide Agribusiness Ins. Co.*, 841 N.W.2d 853, 858 (Iowa 2014) (quoting this definition of "interpretation" from *Boelman*); *Nationwide Agri–Business Ins. Co. v. Goodwin*, 782 N.W.2d 465, 470 (Iowa 2010) ("'[I]nterpretation is the process of determining the meaning of the words used in the policy.'" (quoting *Thomas v. Progressive Cas. Ins. Co.*, 749 N.W.2d 678, 681 (Iowa 2008)). In contrast, "[c]onstruction is the process of giving legal effect to a contract." *Id.*

As the Iowa Supreme Court explained in *Boelman*, "Policy interpretation is always an issue for the court, unless [the court is] required to rely upon extrinsic evidence or choose between reasonable inferences from extrinsic evidence." *Id.* (citing *Connie's Constr. Co. v. Fireman's Fund Ins. Co.*, 227 N.W.2d 207, 210 (Iowa 1975)). The court then identified several rules of "interpretation." First, "[i]f the policy does not define a term, [the court must] give the word its ordinary meaning." *Id.* (citing *Interstate Power Co. v. Ins. Co. of N. Am.*, 603 N.W.2d 751, 754 (Iowa 1999)); *accord Farm Bureau Life Ins. Co. v. Holmes Murphy & Assocs., Inc.*, 831 N.W.2d 129, 134 (Iowa 2013) ("When words are left undefined in a policy, we give them their ordinary meanings— meanings which a reasonable person would give them."). More specifically, "[i]n

searching for the ordinary meanings of undefined terms in insurance policies [Iowa courts] commonly refer to dictionaries." *Holmes Murphy & Assocs., Inc.*, 831 N.W.2d at 134. Second, "[t]he plain meaning of the insurance contract generally prevails." *Boelman*, 825 N.W.2d at 501 (citing *Thomas*, 749 N.W.2d at 682). Third, the court must "read the policy as a whole, . . . not seriatim by clauses," because "'[w]ords in an insurance policy are to be applied to subjects that seem most properly related by context and applicability.'" *Id.* (quoting *Jones v. State Farm Mut. Auto. Ins. Co.*, 760 N.W.2d 186, 188 (Iowa 2008)); *accord Holmes Murphy & Assocs., Inc.*, 831 N.W.2d at 134 ("We read the insurance contract in its entirety, rather than reading clauses in isolation, to determine whether a policy provision is subject to two equally proper interpretations."). Fourth, the court "will not interpret an insurance policy to render any part superfluous, unless doing so is reasonable and necessary to preserve the structure and format of the provision." *Id.* at 502 (citing *Thomas*, 749 N.W.2d at 685). Fifth, the court must "interpret the policy language from a reasonable rather than a hypertechnical viewpoint." *Id.* (citing *Steel Prods. Co. v. Millers Nat'l Ins. Co.*, 209 N.W.2d 32, 36 (Iowa 1973)); *accord Holmes Murphy & Assocs., Inc.*, 831 N.W.2d at 134 ("We do not typically give [undefined terms] meanings only specialists or experts would understand.").

"If an insurance policy and its exclusions are clear, the court 'will not "'write a new contract of insurance"'' for the parties." *Boelman*, 826 N.W.2d at 502 (quoting *Thomas*, 749 N.W.2d at 682, in turn quoting *Cairns v. Grinnell Mut. Reins. Co.*, 398 N.W.2d 821, 824 (Iowa 1987)); *accord Holmes Murphy & Assocs., Inc.*, 831 N.W.2d at 134 ("Ultimately, if there is no ambiguity, the court will not rewrite the policy for the parties."). An "ambiguity" arises, however, applying an "objective test," "if the language is susceptible to two *reasonable* interpretations," reading the policy as a whole. *Id.* at 501 (emphasis in the original); *see also Hagenow*, 846 N.W.2d at 377 ("We have

said '[a]n ambiguity exists when, after application of our relevant rules of interpretation, a genuine uncertainty results as to which of two or more meanings is proper.'" (quoting *Petersen*, 679 N.W.2d at 576)); *Homes & Murphy & Assocs., Inc.*, 831 N.W.2d at 134 (in determining ambiguity, "we examine whether the policy language, viewed objectively, is fairly susceptible to two interpretations"). "An insurance policy is not ambiguous, however, just because the parties disagree as to the meaning of its terms." *Id.* at 502 (citing *Essex Ins. Co. v. Fieldhouse, Inc.*, 506 N.W.2d 772, 776 (Iowa 1993)); *accord Holmes Murphy & Assocs., Inc.*, 831 N.W.2d at 134 ("Mere disagreement, however, as to the meaning of the terms, does not establish ambiguity.").

Although "interpretation" is an issue for the court in most circumstances, "construction"—determining the "legal effect" of policy language, as interpreted—"is always a matter of law for the court." *Id.* at 501. As the Iowa Supreme Court explained in *Boelman*,

> The cardinal rule of construing insurance policies is that except in cases of ambiguity, the intent of the parties must control, and the court determines the intent of the parties by looking at what the policy itself says. [*Thomas*, 749 N.W.2d at 682.] We consider the parties' intent at the time the policy was sold, not in hindsight. *Ferguson v. Allied Mut. Ins. Co.*, 512 N.W.2d 296, 299 (Iowa 1994). We will not strain the words or phrases of the policy in order to find liability that the policy did not intend and the insured did not purchase. *Thomas*, 749 N.W.2d at 682.

*Boelman*, 826 N.W.2d at 501; *accord Holmes Murphy & Assocs., Inc.*, 831 N.W.2d at 133-34.[8] If the policy is ambiguous, however, the court must "adopt the construction

_____

[8] The Iowa Supreme Court's subsequent decision in *Hagenow* appears to blur the lines between "interpretation" and "construction," because the court describes its

most favorable to the insured." *Id.* at 502 (citing *Hamm v. Allied Mut. Ins. Co.*, 612 N.W.2d 775, 778 (Iowa 2000)); *cf. Holmes Murphy & Assocs., Inc.*, 831 N.W.2d at 134 ("If a word is susceptible to two interpretations, typically we adopt an interpretation favoring the insured.").

As to "exclusions" of coverage in insurance policies—the provisions specifically at issue on the parties' cross-motions for summary judgment in this case—the Iowa Supreme Court explained in *Boelman*, "'"An insurer assumes a duty to define any limitations or exclusionary clauses in clear and explicit terms."'" *Id.* (quoting *Thomas*, 749 N.W.2d at 682, in turn quoting *Hornick v. Owners Ins. Co.*, 511 N.W.2d 370, 374 (Iowa 1993)). Thus, courts must "strictly construe exclusions against the insurer." *Id.* (citing *Ferguson v. Allied Mut. Ins. Co.*, 512 N.W.2d 296, 299 (Iowa 1994)). Doing so is appropriate, "because insurance policies constitute adhesion contracts." *Id.* (citing *Allied Mut. Ins. Co. v. Costello*, 557 N.W.2d 284, 286 (Iowa 1996)).

---

fundamental task to be "to *interpret* the language of the insurance policy," then immediately states that the court must "strive to ascertain the intent of the parties at the time the policy was sold" and that the court ordinarily will "determine the parties' intent from the policy's language, unless the policy is ambiguous." *Hagenow*, 846 N.W.2d at 376-77 (emphasis added) (internal quotation marks and citations omitted). As set out in the body of this decision, the court in *Boelman* stated these principles concerning "intent of the parties" as principles of *construction*. 826 N.W.2d at 501. It seems to me that "intent of the parties" is more instructive on the "legal effect" of the policy's language, *i.e.*, its "construction," than it is on the "meaning" of policy language, *i.e.*, its "interpretation." *See id.* Nevertheless, it is clear that the principles concerning "intent of the parties," whether categorized as matters of "interpretation" or matters of "construction," are plainly relevant to the ultimate question of coverage under the policy.

### C.     The Effect Of The "Insured Vs.
####        Insured Exclusion"

The first provision that I must interpret and construe on the parties' cross-motions

for summary judgment concerning coverage is the "insured vs. insured exclusion."

Because this case is before me on cross-motions for summary judgment, I find it most

appropriate to summarize all of the respective arguments by the FDIC-R and Progressive[9]

without regard to whether those arguments were presented in an opening brief or reply

brief in support of the party's own motion or in a brief in response to the opposing party's

motion.

### 1.     Arguments of the parties

The FDIC-R argues that the "insured vs. insured exclusion" does not bar coverage

in this case, because the definition of **Company** in the Vantus Policy does not include or

refer to the FDIC-R, regulators, receivers, or any liquidating entity. Thus, the FDIC-R

argues that its action against the D&O Defendants is not "brought" or "maintained" "by,

on behalf of, or at the behest of" the **Company**, that is, the failed Bank. Indeed, the

FDIC-R points out, it filed its own lawsuit against the D&O Defendants more than three

_____

[9] In their Brief In Support Of Motion For Summary Judgment (docket no. 125-1), the D&O Defendants explain that their Brief is "a truncated version" of the Brief filed by the FDIC-R in support of its Motion For Summary Judgment; that the undisputed facts, circumstances, arguments, and authorities concerning insurance coverage issues are the same for the D&O Defendants as they are for the FDIC-R; and that the D&O Defendants filed a separate Motion For Summary Judgment because Progressive would not stipulate and agree that they could file a simple "joinder" in the FDIC-R's Motion For Summary Judgment. The D&O Defendants explain, further, that their Brief does not contain any arguments or authorities that do not also appear in the FDIC-R's Brief and that, to the extent that any additional material is found in the FDIC-R's Brief, the D&O Defendants incorporate that material into their own Brief by reference. Consequently, I need not summarize separately the D&O Defendants' arguments as I consider the parties' cross-motions for summary judgment on the effect of the "insured vs. insured exclusion."

years after Vantus Bank failed, and no one from Vantus Bank had any involvement with bringing or maintaining the FDIC-R's claims. The FDIC-R also argues that it is wholly independent of the failed Bank and has statutory rights, duties, and interests beyond those of the failed Bank, including exclusive rights to bring certain claims, with the goal of maximizing recoveries for the receivership and its creditors, including the FDIC's Deposit Insurance Fund. The FDIC-R argues that whether or not the claims it asserts might have "belonged" to the Bank before its failure is irrelevant, where the FDIC-R is empowered by statute to bring such claims now. The FDIC-R also argues that the undefined phrase "on behalf of" in the "insured vs. insured exclusion" must be given its ordinary meaning, as defined in standard dictionaries, and that its action does not fit such an ordinary meaning as an action "on behalf of" the failed Bank.

The FDIC-R also rejects Progressive's contention that the FDIC-R merely "steps into the shoes" of the failed Bank, because the FDIC-R contends that it has statutory rights and responsibilities beyond acting as a mere instrumentality or representative of the failed Bank. For example, the FDIC-R argues that it has the specific power to bring "gross negligence" claims against directors and officers of failed institutions "on behalf of, . . . [and] for the benefit of, the [FDIC]," pursuant to 12 U.S.C. § 1821(k). The FDIC-R argues that *O'Melveny & Meyers v. FDIC*, 512 U.S. 79 (1994), on which Progressive relies for its argument that the FDIC-R "steps into the shoes" of the failed Bank, is distinguishable, where, on remand, the lower courts held that the FDIC-R was not a typical successor in interest, the Supreme Court's decision did not involve the scope of an "insured vs. insured exclusion," and the Supreme Court was not asked to and did not explain whether "stepping into the shoes" of a failed bank has the identical legal effect of acting "on behalf of" an open bank. The FDIC-R also argues that who "owned" the claim is not part of the test for coverage under or in the language of the "insured vs. insured exclusion."

37

The FDIC-R contends that several courts have found that the "insured vs. insured exclusion" at issue here, or ones like it, are inapplicable to the FDIC-R, both in the wake of the banking crisis in the late 1980s and early 1990s, and in the wake of the "Great Recession" in the first decade of this century. The FDIC-R argues that the purpose of the "insured vs. insured exclusion" was to protect against "collusive cases" by bank insiders for the benefit of the bank, not to preclude actions by the FDIC-R. The FDIC-R points out that courts have also held that the "shareholder derivative exception" to the "insured vs. insured exclusion" applies, because, among other claims, the FDIC-R brings such claims on behalf of shareholders.

Progressive argues that the "insured vs. insured exclusion" applies on its face. First, Progressive argues that the FDIC-R's claims are "by or on behalf of" the Bank, because it "steps into the shoes" of the failed Bank, as explained in *O'Melveny & Meyers v. FDIC*, 512 U.S. 79, 86-87 (1994). Progressive argues that, no matter how many "hats" the FDIC-R claims to wear, it is plainly pursuing against the D&O Defendants claims that "belonged" to the Bank and seeks to recover losses that the Bank suffered as a result of the D&O Defendants' wrongful acts. Progressive also argues that § 1821(k) merely establishes a "liability floor" for director and officer misconduct, but does not create a claim different from the Bank's state-law claim against the directors and officers for mismanagement. Progressive also argues that the "shareholder derivative exception" does not apply to the FDIC-R's claims, because the FDIC-R's suit is not a shareholder derivative action.

As to pertinent case law, Progressive argues that *O'Melveny & Meyers* supersedes any cases from the banking crisis in the 1980s and 1990s concerning the effect of the "insured vs. insured exclusion," because it expressly holds that the FDIC-R "steps into the shoes" of the failed Bank and that any defenses good against the failed Bank are good against the FDIC-R. Progressive also argues that the purpose of the "insured vs. insured

exclusion" is not simply to foreclose "collusive cases," but whatever the "intent" of the clause was, that "intent" is irrelevant to the applicability of the clause to particular claims.

The parties also assert numerous arguments that I find it unnecessary to reach. Among those arguments, the parties dispute whether extrinsic evidence demonstrates that the "insured vs. insured exclusion" was intended to bar claims such as the FDIC-R has brought against the D&O Defendants and whether extrinsic evidence can be considered at all. They also dispute whether the "reasonable expectations" of the D&O Defendants demonstrate that the "insured vs. insured exclusion" does or does not apply and whether such "reasonable expectations" are even relevant. They also dispute whether the industry practice demonstrates that "regulatory exclusions," rather than "insured vs. insured exclusions," are used when the insurer intends to bar coverage for claims by the FDIC-R and whether any evidence concerning "regulatory exclusions" is relevant, where the Vantus Policy contained no such exclusion. Finally, they dispute whether the "insured vs. insured exclusion" in the Vantus Policy is "ambiguous."

### 2. Analysis[10]

#### a. Interpretation

I must first "interpret" the "insured vs. insured exclusion"—that is, "give meaning to contractual words in the policy"—"'read[ing] the policy as a whole,'" not just this

---

[10] I am well aware of the case law on the effect of various "insured vs. insured exclusions," some more and some less like the one at issue here, on claims by the FDIC against directors and officers of failed banks, from both the banking crisis in the 1980s and 1990s and the more recent "Great Recession." Not surprisingly, the FDIC-R and Progressive each assert that the "better reasoned" decisions agree with its position. Indeed, as the First Circuit Court of Appeals remarked almost a year ago, "What we have is a classic battle of dueling caselaw." *W Holding Co., Inc. v. AIG Ins. Co.-Puerto Rico*, 748 F.3d 377, 386 (1st Cir. 2014). The situation has not changed in the intervening months. Even if I could take comfort in some well-settled case law or find one line of

exclusion in isolation. *Boelman*, 826 N.W.2d at 501 (quoting *Jones*, 760 N.W.2d at 188). The focus of the parties' dispute is on the meaning of the phrase "**Loss** in connection with any **Claim** by, on behalf of, or at the behest of the **Company**, any affiliate of the **Company** or any **Insured Person** in any capacity." Vantus Policy, § V(J), Defendants' Joint Appendix II at 212.

First, I must look to the Vantus Policy itself for express definitions of any terms in the "insured vs. insured exclusion." The definitions of **Company**, however, in both the original Vantus Policy and the amended definition in the extended Discovery Period (Activation) endorsement, lack any express reference to a "receiver" as included within the meaning of **Company**. *See* Vantus Policy, § IV(E), Defendants' Joint Appendix II at 207 (definition of **Company**); Vantus Policy, Amendment To Declarations (effective 09/04/2007), Defendants' Joint Appendix II at 204 (Item 1 listing entities identified as the **Company**); Vantus Policy, Discovery Period Activation, Amendment to § IV(E), Defendants' Joint Appendix at 198 (amending the definition of **Company**); Vantus Policy, Discovery Activation, Declarations Page, Item 1, Defendants' Appendix II at 200 (Item 1 listing entities identified as the **Company**); *see also, supra*, page 24 (setting out the definitions and lists of entities). Thus, **Company** means, first of all, Vantus Bank itself, including only the specific entities identified in the Declarations, but does not mean the FDIC-R. Progressive does not contend that the FDIC-R is a "**Subsidiary** created or acquired" by Vantus Bank or any entity identified in the Declarations, which would also fall within the definition of the **Company**. Progressive also has not argued that the FDIC-

---

authority "better reasoned" or more convincing, however, I would ultimately have to interpret and construe *this* "insured vs. insured exclusion" according to *Iowa law*, and avoid any appearance of adopting some kind of federal common law on the question. *See, e.g., O'Melveny & Meyers v. v. FDIC*, 512 U.S. 79, 87 (1994) (noting that the circumstances in which creation of federal common law is justified are "few and restricted").

R's claims are "by, on behalf of, or at the behest of" "any affiliate of the **Company**" or any **Insured Person**, although the "insured vs. insured exclusion" would also bar coverage for such claims. *See* Vantus Policy, § V(J) ("insured vs. insured exclusion"), Defendants' Joint Appendix II at 212.

Reading the Vantus Policy "as a whole," by looking to provisions addressing "'subjects that seem most properly related by context and applicability,'" *see Boelman*, 826 N.W.2d at 501 (quoting *Jones*, 760 N.W.2d at 188), I also note that, in *other* provisions, the Vantus Policy expressly *includes* references to "receivers," such as the FDIC-R, as well as "assigns," and "legal representatives," which are kinds of entities that might succeed to the **Company's** interests or legal position. *See, e.g.,* Vantus Policy, § II(A), Defendants' Joint Appendix II at 205-06 (defining coverage for **Claims** made against the "legal representatives or assigns" of **Insured Persons** in certain circumstances); *id.,* § IV(I), Defendants' Joint Appendix II at 208 (defining **Financial Impairment** as, *inter alia*, "status of the **Company** resulting from . . . . the appointment of any state or federal official, regulatory agency or court of any *receiver*, conservator, liquidator, trustee, rehabilitator or similar official to take control of, supervise, manage, or liquidate the **Company** or any **Subsidiary**. . . ." (emphasis added)). Thus, when the Vantus Policy intended to address coverage issues relating to "receivers" and other successors to the Bank, it expressly identified such successors.

In short, as a matter of either "interpretation" or "construction," I conclude that the "intent of the parties," at the time that they entered into the Vantus Policy, determined "by looking at what the policy itself says,'" *compare id.* (identifying "intent of the parties" as a principle of "construction" (quoting *Thomas*, 749 N.W.2d at 682)); *with Hagenow*, 846 N.W.2d at 376-77 (identifying "intent of the parties" as a principle of "interpretation"), was that **Company**, **Subsidiary**, and **Insured Person** *unambiguously* do *not* mean the FDIC-R as receiver for Vantus Bank and, consequently, the FDIC-R's

claims are not "by . . . the **Company**, any affiliate of the **Company**, or any **Insured Person**."

Not too surprisingly, then, the parties' focus shifts to the phrase "on behalf of, or at the behest of the **Company**."[11] The terms "on behalf of" and "at the behest of" are not in bold in the Vantus Policy itself, indicating that they are not specifically defined in the Vantus Policy. I also have found no definitions for those terms in the Vantus Policy, and the parties have pointed me to none. This lack of specific definitions in the Vantus Policy means that I must "give the word[s] [their] ordinary meaning," *id.* (citing *Interstate Power Co.*, 603 N.W.2d at 754), and that the "plain meaning" of these terms in the insurance contract generally prevails. *Id.* (citing *Thomas*, 749 N.W.2d at 682).

Progressive has not argued that the FDIC-R's claims were made "at the behest" of the **Company**, nor could it. As a matter of "interpretation," the "ordinary" or "plain" meaning of this undefined phrase is drawn from dictionaries. *Holmes Murphy & Assocs., Inc.*, 831 N.W.2d at 134 ("In searching for the ordinary meanings of undefined terms in insurance policies [Iowa courts] commonly refer to dictionaries."). For example, the on-line edition of the OXFORD ENGLISH DICTIONARY (OED) defines "behest," in the relevant sense, as "[a] command, injunction, bidding." *See* http://www.oed.com ("behest," definition 2.). Progressive has not asserted as an undisputed fact any involvement of the Bank in commanding or bidding the FDIC-R to bring its claims against the D&O Defendants, so there are no genuine issues of material fact, and no undisputed facts, concerning the applicability of "at the behest of." This phrase simply does not apply here.

---

[11] Again, Progressive does not argue that the FDIC-R's claims are "on behalf of, or at the behest of . . . any affiliate of the **Company**, or any **Insured Person**."

Thus, the real "fighting issue" is whether the FDIC-R has brought its claims "on behalf of" Vantus Bank. As a matter of "interpretation," the "ordinary" or "plain" meaning of this undefined phrase, *see Boelman*, 826 N.W.2d at 501, is also drawn from dictionaries. *Holmes Murphy & Assocs., Inc.*, 831 N.W.2d at 134. For example, the OED defines "behalf," in the relevant sense, as follows:

> On the part of (another), in the name of, as the agent or representative of, on account of, for, instead of. (With the notion of official agency.)

http://www.oed.com ("behalf," definition 1.c.). This is the appropriate interpretation, "from a reasonable rather than a hypertechnical viewpoint." *See Boelman*, 826 N.W.2d at 501 (citing *Steel Prods. Co.*, 209 N.W.2d at 36); *accord Holmes Murphy & Assocs., Inc.*, 831 N.W.2d at 134 ("We do not typically give [undefined terms] meanings only specialists or experts would understand."). Furthermore, this interpretation is appropriate, based on reading the Vantus Policy "as a whole" and looking to provisions addressing "'subjects that seem most properly related by context and applicability.'" *See id.* (quoting *Jones*, 760 N.W.2d at 188). No party has suggested, and I have not found, any other provision of the Vantus Policy that would either shed light on or conflict with this interpretation.

On the other hand, I find no basis to graft onto this interpretation of "on behalf of . . . the **Company**" an action by a receiver or other successor. Again, in *other* provisions, the Vantus Policy expressly *includes* references to "receivers," such as the FDIC-R, as well as "assigns," and "legal representatives," which are kinds of entities that might succeed to the "**Company's**" interests or legal position. *See, e.g.,* Vantus Policy, § II(A), Defendants' Joint Appendix II at 205-06 (defining coverage for **Claims** made against **Insured Person's** "legal representatives or assigns" in certain circumstances); *id..* § IV(I), Defendants' Joint Appendix II at 208 (defining **Financial**

**Impairment** as, *inter alia*, "status of the **Company** resulting from . . . . the appointment of any state or federal . . . *receiver* . . . ." (emphasis added)). Thus, as I noted above, when the Vantus Policy intended to address coverage issues relating to "receivers" and other successors to the Bank, it expressly identified such successors. *See Boelman*, 826 N.W.2d at 501 (looking to provisions addressing "'subjects that seem most properly related by context and applicability'" to interpret terms (quoting *Jones*, 760 N.W.2d at 188)).

Also, there is nothing ambiguous about "on behalf of . . . the **Company**," after application of the rules of interpretation, because the language is not "susceptible of two *reasonable* interpretations." *Boelman*, 826 N.W.2d at 501 (emphasis in the original). This is so, notwithstanding Progressive's assertion that "on behalf of . . . the **Company**" means the same thing as "step[ping] into the shoes of . . . the **Company**," citing *O'Melveny & Meyers v. FDIC*, 512 U.S. 79 (1994). *Boelman*, 826 N.W.2d at 502 ("An insurance policy is not ambiguous, however, just because the parties disagree as to the meaning of its terms.").

One of several problems with Progressive's reliance on *O'Melveny & Meyers* as establishing the equivalence of "on behalf of" in the Vantus Policy and "step[ping] into the shoes of" is that the United States Supreme Court never so much as mentioned such an equivalence, or even the word "behalf," in that decision. Another problem is that supplying the meaning of "on behalf of" from *O'Melveny & Meyers* seems to me to be the sort of "hypertechnical viewpoint" eschewed under Iowa law. *Boelman*, 826 N.W.2d at 501. Yet another problem is that interpreting "on behalf of" as "step[ping] into the shoes of," based on *O'Melveny & Meyers*, would seem to be tantamount to creation of federal common law on the meaning of "on behalf of," where the Supreme Court itself eschewed creation of federal common law concerning claims by the FDIC as receiver for

a bank in that very decision. *See, e.g.*, 512 U.S. at 87 (noting that the circumstances in which creation of federal common law is justified are "few and restricted").

The biggest problem, however, is that, in *O'Melveny & Meyers*, the Court did not purport to interpret, let alone construe, *any* "insured vs. insured exclusion," and certainly did not address the one at issue here. Rather, in *O'Melveny & Meyers*, the Court addressed the question of whether, in a suit by the FDIC, as receiver of a federally insured bank, a federal-law rule or a state-law rule of decision governs the tort liability of attorneys who provided services to the bank. 512 U.S. at 80. The case in *O'Melveny & Meyers* also involved a receivership by the FDIC that began in 1986, asserting claims that arose earlier, but FIRREA—the authority for the FDIC-R's claim in its lawsuit against the D&O Defendants—was not even enacted until 1989, and the Court declined to view it as "self-evident" that FIRREA would have taken effect in time to be relevant to the case then before it. 512 U.S. at 87. In *O'Melveny & Meyers*, then, the Court certainly did not *hold* that, as a matter of law, "step[ping] into the shoes of" is equivalent to or a proper interpretation of "on behalf of" in the "insured vs. insured exclusion" in the Vantus Policy, contrary to Progressive's contentions.

At most, in *O'Melveny & Meyers*, the Court *opined* that the language in 12 U.S.C. § 1821(d)(2)(A)(i)—a provision of FIRREA, stating, in part, that "the [FDIC] shall, . . . by operation of law, succeed to . . . all rights, titles, powers, and privileges of the insured depository institution. . . ."—"*appears to indicate* that the FDIC as receiver 'steps into the shoes' of the failed S & L, obtaining the rights 'of the insured depository institution' that existed prior to receivership." 512 U.S. at 86 (emphasis added) (internal citation omitted); *see also id.* at 87 (stating, "It is hard to avoid the conclusion that § 1821(d)(2)(A)(i) places the FDIC in the shoes of the insolvent S & L, to work out its claims under state law, except where some provision in the extensive framework of FIRREA provides otherwise," but declining to assume that FIRREA would have taken

effect in time to have any effect on the case before the Court). Opining as to indications of—but not deciding as a matter of law that there was—an equivalence in meaning between different *statutory* language and "step[ping] into the shoes of" certainly is not deciding that there was such an equivalence between "on behalf of" in the Vantus Policy and "step[ping] into the shoes of." Furthermore, in *O'Melveny & Meyers*, the United States Supreme Court stated only that "in litigation by the FDIC asserting the claims *of* the S & L—in this case California tort claims potentially defeasible by a showing that the S & L's officers had knowledge—"'"any defense good against the original party is good against the receiver."'" *Id.* (emphasis in the original) (quoting the case below, in turn quoting *Allen v. Ramsay*, 179 Cal. App. 2d 843, 854, 4 Cal. Rptr. 575, 583 (1960)). Thus, the Court did *not* hold, as Progressive asserts, that the claims by the FDIC *necessarily are* claims of or that belonged to the failed bank. The Court only explained that the FDIC-R "steps into the shoes of" the bank when the FDIC *is* asserting the claims *of* the bank.

Finally, in *O'Melveny & Meyers*, the Court did not even address the effect of the remainder of § 1821(d)(2)(A)(i), providing that the FDIC-R succeeds to the rights of others, besides the insured institution. That provision provides as follows:

> The Corporation shall, as conservator or receiver, and by operation of law, succeed to--
>
>> (i) *all rights, titles, powers, and privileges* of the insured depository institution, and *of any stockholder, member, accountholder, depositor, officer, or director of such institution* with respect to the institution and the assets of the institution[.]

12 U.S.C. § 1821(d)(2)(A)(i) (emphasis added). Nor did the Court consider whether § 1821(k)—which authorizes the FDIC to pursue an action for liability of directors and officers of failed institutions where such "action is prosecuted wholly or partially for the

benefit of the Corporation"—only authorizes a suit by the FDIC-R "step[ping] into the shoes of" the failed bank, rather than a suit by the FDIC-R on its own "behalf." Indeed, for all the noise that Progressive makes about the Supreme Court's decision in *O'Melveny & Meyers* providing controlling law here, I find that decision is all but irrelevant to the disposition of any issue in this case.[12]

### b. Construction

Thus, I must still decide the "construction"—that is, the "legal effect"—of the "insured vs. insured exclusion," as I have interpreted it, and that is a question of law for the court. *See Boelman*, 826 N.W.2d at 501. Here, because I have found no ambiguity, I must apply "[t]he cardinal rule of construing insurance policies," which is that "the intent of the parties must control, and the court determines the intent of the parties by looking at what the policy itself says." *Id.*

I need not "strain the words or phrases of the policy," *see id.* ("We will not strain the words or phrases of the policy in order to find liability that the policy did not intend and the insured did not purchase." (quoting *Thomas*, 749 N.W.2d at 682)), to conclude that the Vantus Policy itself makes clear that the intent of the "insured vs. insured exclusion" was to preclude *collusive* suits by and among the **Company** and **Insured Persons**, such as the D&O Defendants, to recover for mismanagement. *See, e.g., Biltmore Assocs., L.L.C. v. Twin City Fire Ins. Co.*, 572 F.3d 663, 668 (9th Cir. 2009) (case on which Progressive otherwise relies, observing that "insured vs. insured exclusions" were attempts to preclude collusive suits and intracompany claims, under

---

[12] Similarly, I find that *Biltmore Associates, L.L.C. v. Twin City Fire Insurance Co.*, 572 F.3d 663 (9th Cir. 2009), on which Progressive also relies, is all but irrelevant. That case did not involve the effect of an "insured vs. insured exclusion" on coverage for claims by the FDIC-R, but the effect of such an exclusion on a suit by the company, as a debtor in possession and trustee of creditors, against its own directors and officers. Such a suit was clearly "by and on behalf of" the company.

director and officer liability policies intended to protect against claims by outsiders); *Township of Center, Butler Cnty., Penn. v. First Mercury Syndicate, Inc.*, 117 F.3d 115, 1119 (11th Cir. 1997) ("The primary focus of the ['insured vs. insured'] exclusion is to prevent collusive suits in which an insured company may seek to force its insurer to pay for the poor business decisions of its officers or managers."). This intent is apparent from interplay between the definition of **Claim**, *inter alia*, as a civil lawsuit "*against* an **Insured Person** or *against* the **Company**," and the "insured vs. insured exclusion," which bars coverage for claims "*by*, on behalf of, or at the behest of" the same entities. *Compare* Vantus Policy, § IV(C), Defendants' Joint Appendix II at 207 (defining **Claim** (emphasis added)); *with* Vantus Policy, § V(J), Defendants' Joint Appendix II at 212 (the "insured vs. insured exclusion" (emphasis added)). The FDIC-R's lawsuit against the D&O Defendants is not such a "collusive" action, because it was brought by the FDIC-R well after Vantus Bank was closed; the FDIC-R's lawsuit was brought under the FDIC-R's independent statutory authority in § 1821(d)(2)(A)(i) and § 1821(k); and Progressive has identified no evidence to suggest or to show beyond dispute that the FDIC-R's lawsuit involved the solicitation, assistance, involvement, or participation of anyone from the Bank in bringing or maintaining the claims.

Indeed, statutory provisions, including § 1821(d)(2)(A)(i) and § 1821(k), concerning the authority of the FDIC-R to "wear many hats," which is controlling in this case filed after FIRREA was enacted in 1989, demonstrate conclusively that the FDIC-R's claims were *not* brought "in the name of, as the agent or representative of, on account of, for, [or] instead of" Vantus Bank. *See* http://www.oed.com ("behalf," definition 1.c). This is so, because, once a bank is closed and the FDIC-R is appointed as receiver, the FDIC-R has the *exclusive* right to bring the claims at issue here. *See, e.g., In re Beach First Nat'l Bancshares, Inc.*, 702 F.3d 772, 780 (4th Cir. 2012) (with the exception of "direct claims," involving unique damages to the claimant, the FDIC has the exclusive

right to bring claims flowing from acts and harm at the bank level, pursuant to § 1821(d)(2)(A)(i)); *Levin v. Miller*, No. 1:11–cv–1264–SEB–TAB, 2012 WL 1982287, *4 (S.D. Ind. 2012) (citing § 1821(d)(2)(A)(i)); *Lubin v. Cincinnati Ins. Co.*, Civil Action No. 1:09–CV–2985–RWS, 2010 WL 5313754, *12 (N.D. Ga. 2010) (same), *aff'd*, 677 F.3d 1039 (11th Cir. 2012). Because the FDIC-R's right to bring the claims is *exclusive*, it plainly is not bringing the claims "on behalf of" the **Company** or the **Insured Persons**, or even shareholders and other entities listed in § 1821(d)(2)(A)(i), but only on its own "behalf."

Thus, the "insured vs. insured exclusion" does not bar coverage for the FDIC-R's claims.[13]

---

[13] I recognize that some other courts have found "insured vs. insured exclusions," some more similar to the one in the Vantus Policy and some less similar, were "ambiguous." *See, e.g., St. Paul Mercury Ins. Co. v FDIC*, No. 13-14228, 2014 WL 7172472, *7-*8 and n.2 (11th Cir. Dec. 17, 2014) (citing cases). For example, in *St. Paul Mercury*, the Eleventh Circuit Court of Appeals stated, "[I]t seems to us that the most compelling argument [that the exclusion is ambiguous] is that courts who have addressed similarly worded insured v. insured exclusions have reached different results." *Id*. at *7. This statement was in the context of Georgia law, however, which defines an insurance provision as "ambiguous" if it "'is susceptible of two or more *constructions*, even when the multiple *constructions* are all logical and reasonable.'" *Id*. at *6 (emphasis added) (quoting *Hurst v. Grange Mut. Cas. Co.*, 266 Ga. 712, 470 S.E.2d 659, 663 (1996)). In contrast, under Iowa law, "ambiguity" is a matter of "interpretation," not "construction," *see Boelman*, 826 N.W.2d at 501, and I found the *meaning* of the "insured vs. insured exclusion" *unambiguous* using Iowa rules of interpretation. While I acknowledge that different courts have reached different conclusions on whether or not an "insured vs. insured exclusion" bars coverage for claims by the FDIC, I do not believe that difference of opinion establishes *ambiguity* as to the *meaning* of the exclusion, even if it creates some uncertainty about the *construction* or *legal effect* of the exclusion. The position of the First Circuit Court of Appeals in *W Holding Co., Inc.*, more nearly coincides with Iowa law. 748 F.3d at 386. That court concluded that, "[w]ith no controlling authority on whether an insured-versus-insured exclusion applies to the FDIC

A contrary ruling would also be contrary to the principles of Iowa law that "'"[a]n insurer assumes a duty to define any limitations or exclusionary clauses in clear and explicit terms,"'" *Boelman*, 826 N.W.2d at 502 (quoting *Thomas*, 749 N.W.2d at 682, in turn quoting *Hornick*, 511 N.W.2d at 374), and that a court must "strictly construe exclusions against the insurer." *Id.* (citing *Ferguson*, 512 N.W.2d at 299). Contrary to Progressive's assertions, any supposed exclusion of coverage for claims by the FDIC-R in the "insured vs. insured exclusion" is anything but "clear and explicit." *Id.* While I need not "strain the words or phrases of the policy" *to find coverage* for the FDIC-R's claims, *see id.* ("We will not strain the words or phrases of the policy in order to find liability that the policy did not intend and the insured did not purchase." (quoting *Thomas*, 749 N.W.2d at 682), I would certainly have to "strain the words or phrases of the policy" to find *an exclusion of coverage* for those claims in the "insured vs. insured exclusion," and I construe the exclusion in favor of the insured D&O Defendants as *not* excluding coverage.

### 3.    *Summary*

As a matter of law, the "insured vs. insured exclusion" does not bar coverage for the D&O Defendants for the FDIC-R's claims. Consequently, the FDIC-R and the D&O Defendants are entitled to summary judgment to that effect, and Progressive's Motion For Summary Judgment for a contrary declaration is denied.

---

in a situation like ours; with non-binding cases pointing in different directions; and with our obligation to resolve any doubts in the insured's favor," the court could not hold that "there is *zero* likelihood" that the "insured vs. insured exclusion" would not bar coverage. 748 F.3d at 386 (emphasis in the original). For the reasons stated in this decision, I conclude that, as a matter of *Iowa law*, the *construction* of *this* "insured vs. insured exclusion" does not bar coverage for the FDIC-R's claims.

### D. The Effect Of The "Investment Loss Carve-Out"

The second provision of the Vantus Policy that I must interpret and construe on the parties' cross-motions for summary judgment concerning coverage is the "investment loss carve-out." Vantus Policy, § IV(N)(6), Defendants' Joint Appendix II at 209; *see, supra*, beginning on page 27 (definition of **Loss** including the "investment loss carve-out"). Again, because this case is before me on cross-motions for summary judgment, I find it most appropriate to summarize all of the respective arguments by the FDIC-R and Progressive,[14] without regard to whether those arguments were presented in an opening brief or reply brief in support of the party's own motion or in a brief in response to the opposing party's motion.

#### 1. Arguments of the parties

The FDIC-R contends that, to be excluded from coverage under the "investment loss carve-out," it is clear that any investment loss must be "unrelated" to any **Wrongful Act**. Here, however, the FDIC-R argues that it has alleged **Wrongful Acts**, not simply market decline, and, therefore, the "investment loss carve-out" does not apply to bar coverage. The FDIC-R rejects Progressive's argument that the FDIC-R's reading of the "investment loss carve-out" would make Progressive a guarantor for Vantus Bank's securities portfolio, because the FDIC-R argues that it seeks to hold the D&O Defendants liable for wrongful acts in management of the Bank, which is the key risk that the D&O Defendants reasonably believed that the Vantus Policy covered. The FDIC-R argues that its claim does not implicate the "investment loss carve-out," because it does not involve investment loss, but loss resulting from the D&O Defendants' lack of reasonable diligence

---

[14] Again, the D&O Defendants' adoption of all of the arguments of the FDIC-R on this issue means that I need not summarize separately the D&O Defendants' arguments as I consider the parties' cross-motions for summary judgment on the effect of the "investment loss carve-out."

in deciding to purchase the securities in the first instance, failure to adequately manage risks, and noncompliance with OTS guidelines, which resulted in significant damage. Thus, the FDIC-R argues that what is at issue is loss from tortious conduct, not loss from market fluctuation. The FDIC-R also argues that, as long as the **Loss** is "related to" an insured's **Wrongful Act**, the "investment loss carve-out" does not apply, because "related to" must be broadly construed. The FDIC-R also argues that Progressive has not cited any facts proving that the depreciation of the securities at issue was "due to market fluctuation," while the FDIC-R's experts have opined that it was not.

The FDIC-R also argues that Progressive's construction of the "investment loss carve-out" is contrary to its representations to the D&O Defendants and contrary to insurance industry custom and practice. The FDIC-R also argues that, in information provided to the D&O Defendants, Progressive included as an example of covered claims a shareholder derivative claim for alleged mismanagement. Somewhat more specifically, the FDIC-R argues that Progressive amended the definition of **Loss** to add this carve-out in relation to amendments providing "entity coverage," but now contends that it relates to individual director and officer coverage. The FDIC-R contends that, at a minimum, the "investment loss carve-out" is ambiguous, because it is unclear whether or not it provides coverage for tortious conduct relating to investments, so that the Vantus Policy should be construed in favor of coverage.

Progressive argues, however, that the Vantus Policy was not designed to make it the guarantor of the Bank's unwise investment decisions and that the only recovery that the FDIC-R seeks from the D&O Defendants is the amount that the securities at issue depreciated in value. Thus, Progressive argues that the FDIC-R's claims fall squarely within the "investment loss carve-out." Progressive argues that the FDIC-R improperly separates the phrase "unrelated to a **Wrongful Act**" in the "investment loss carve-out" from the phrase "due to market fluctuation." Progressive argues that, properly read, the

plain language of the "investment loss carve-out" means that, to be excluded, an investment loss must be the result of a depreciation in the value of the investment, and that depreciation in value must be caused by a market fluctuation, not by a **Wrongful Act**. In other words, Progressive contends, the **Wrongful Acts** must have some causal relation to the market fluctuation for there to be coverage. Here, however, Progressive argues that the investment loss that the FDIC-R seeks to recover is precisely the result of a depreciation in the value of the securities and that depreciation was undeniably caused by market fluctuation, not by the alleged **Wrongful Acts** of the D&O Defendants. Indeed, Progressive points out, there would be no claim if the market for such securities had soared. Progressive argues that merely identifying the investment losses as "tort damages" does not establish insurance coverage for them.

Progressive contends that extrinsic evidence is simply not relevant, but if it is considered somehow relevant, it cannot be used to give no effect to unambiguous policy language. Progressive also argues that the addition of the "investment loss carve-out" in the midst of other amendments relating to "entity liability" only demonstrates that there is a *single* definition of **Loss** for both "entity" and "individual" coverage, not that the carve-out only relates to "entity liability." Next, Progressive argues that its representations about and examples of coverage were given with the caveat that they were for "informational purposes" and with cautions to refer to specific policy language. Finally, Progressive contends that the "investment loss carve-out" is not ambiguous and that the cases that the FDIC-R cites to support that contention are distinguishable, inapposite, or wrong.

## 2. Analysis[15]

### a. Interpretation

As I did with the "insured vs. insured exclusion," I must first "interpret" the "investment loss carve-out"—that is, "give meaning to contractual words in the policy"—"'read[ing] the policy as a whole,'" not just this provision in isolation. *Boelman*, 826 N.W.2d at 501 (quoting *Jones*, 760 N.W.2d at 188). I begin by looking in the Vantus Policy itself for express definitions of any of the constituent terms of the "investment loss carve-out."

The definition of **Loss** in the Vantus Policy is plainly relevant to the interpretation of the "investment loss carve-out," because that definition is "'properly related by context and applicability,'" where the "investment loss carve-out" is, in fact, part of the definition of **Loss**. *Id.* (quoting *Jones*, 760 N.W.2d at 188). The definition of **Loss**, excluding specific examples, is "**Defense Costs** and any amount which [the insureds] are legally obligated to pay resulting from a **Claim**." Vantus Policy, § IV(N)(6), Defendants' Joint Appendix II at 209. **Claim** is also defined in the Vantus Policy, *see* Vantus Policy, § IV(C), Defendants' Joint Appendix II at 207; *see also, supra*, page 26, but there does not appear to be any dispute that the FDIC-R's claims against the D&O Defendants in the FDIC-R's lawsuit are **Claims** within the meaning of the Vantus Policy. As a matter of plain or ordinary meaning, the "legally obligated" language, although not defined,

---

[15] In contrast to the "insured vs. insured exclusion," there is a dearth of case law concerning the applicability of an "investment loss carve-out" to claims by the FDIC against directors and officers of banks. This dearth of case law is not disconcerting, however, because, again, I would ultimately have to interpret and construe *this* "investment loss carve-out" according to *Iowa law*, and avoid any appearance of adopting some kind of federal common law on the question. *See, e.g., O'Melveny & Meyers v. v. FDIC*, 512 U.S. 79, 87 (1994) (noting that the circumstances in which creation of federal common law is justified are "few and restricted").

plainly indicates that the obligation to pay the **Claim** in question must have been established by adjudication or other legal means. This reading is confirmed, in context, by the specific listing of "damages, judgments, settlements, pre- and post-judgment interest, punitive or exemplary damages and the multiple portion or any multiplied damage award," all of which are determined by adjudication or other legal means. "Any amount which [the insureds] are legally obligated to pay resulting from a **Claim**" expressly includes "damages." Vantus Policy, § IV.N(6), Defendants' Joint Appendix II at 209. Thus, this definition of **Loss** plainly includes "any amount [of damages] which [the insureds] are legally obligated to pay resulting from a **Claim**."

Progressive argues that, just as plainly, the "investment loss carve-out" carves out of the definition of **Loss**, and thus excludes from coverage, "damages" that are measured by "the depreciation . . . in value of any investment product . . . due to market fluctuation unrelated to any **Wrongful Act**." I agree that this is a reasonable reading of what the "investment loss carve-out" means, reading the "investment loss carve-out" in the context of the closely-related definition of **Loss** in the Vantus Policy. That is not the end of the interpretation of the "investment loss carve-out," however.

The only other term in the "investment loss carve-out" that is defined in the Vantus Policy is **Wrongful Act**. **Wrongful Act** is defined in the Vantus Policy, in pertinent part, as "any actual or alleged act, error, omission, misstatement, misleading statement, neglect or breach of duty by . . . any **Insured Person** in the discharge of their duties . . . ." Vantus Policy, § IV(X), Defendants' Joint Appendix II at 210; *see also, supra*, beginning at page 26 (complete definition). This definition of **Wrongful Act** also plainly, or as a matter of ordinary meaning, includes the conduct alleged in the FDIC-R's claims (which are **Claims** within the meaning of the Vantus Policy) against the D&O Defendants. Thus, if the "damages" that the FDIC-R seeks on its **Claims** arising from the D&O Defendants' **Wrongful Acts** are measured by "the depreciation . . . in value of

55

any investment product . . . due to market fluctuation unrelated to any **Wrongful Act**," then they fall within the "investment loss carve-out." Again, that is not the end of the interpretation of the "investment loss carve-out."

Although certain terms in the "investment loss carve-out" are not in bold and, thus, are not expressly defined in the Vantus Policy, their "context" is adequate to interpret their meaning. *See Boelman*, 826 N.W.2d at 501 ("'Words in an insurance policy are to be applied to subjects that seem most properly related by context and applicability.'" (quoting *Jones*, 760 N.W.2d at 188)). As a matter of "context," it is clear that "investment product" is the general category of items at issue in the "investment loss carve-out" and that the word "including" before a list of other items—"securities, commodities, currencies, options or futures"—means that those other items are a non-exclusive list of examples of "investment products." More importantly, there does not appear to be any dispute that the collaterized debt obligations backed by Trust Preferred Securities (CDO-TruPS) at issue in the FDIC-R's claims against the D&O Defendants are "investment products" within the meaning of the "investment loss carve-out."

Another undefined term in the "investment loss carve-out" is "depreciation." The "ordinary" or "plain" meaning of this term is drawn from dictionaries. *See Holmes Murphy & Assocs., Inc.*, 831 N.W.2d at 134 ("In searching for the ordinary meanings of undefined terms in insurance policies [Iowa courts] commonly refer to dictionaries."). For example, the on-line edition of the OED defines "depreciation," in the sense relevant here, as "[l]owering of value; fall in the exchangeable value (of money)." *See* http://www.oed.com ("depreciation," definition 1.a.). This "ordinary" meaning appears to me to be reinforced, in "context," by the immediately following prepositional phrase "of any investment product" and adjectival phrase "due to market fluctuation." From the context, I must assume that the adjectival phrase "due to market fluctuation" modifies "depreciation . . . in value of any investment product." In that phrase, the "ordinary"

or "dictionary" meaning of "fluctuation," in the sense relevant here, is "[a]n alternate rise and fall in amount or degree, *price or value*, temperature, etc." *See id.* ("fluctuation," definition 2.b., with emphasis added); *see also id.* ("fluctuation," definition 2.a., "The action or condition of passing more or less rapidly and suddenly from one state to another; an instance of this; repeated variation, vicissitude. In pl. 'ups and downs.'").

Taking a closer look at the adjectival phrase "due to market fluctuation," the undefined phrase "due to" must also be given its "ordinary," "dictionary" meaning. *Holmes Murphy & Assocs., Inc.*, 831 N.W.2d at 134. As the OED explains, "due to" is a prepositional phrase meaning "owing to," *see* http://www.oed.com ("due," definition 9.d. "due to"), where "owing to," in turn, in the relevant sense, means "in consequence of, on account of, because of." *See id.* ("owing," definition 3.b. "owing to"). Thus, the plain meaning of the phrase "due to market fluctuation" is that the "market fluctuation" has a *causal* effect on the "depreciation . . . in value of [the] investment product."

There are two critical issues for interpretation of this provision yet to be addressed, one grammatical and one definitional. As to the grammatical issue, pursuant to the "investment loss carve-out," what is "carved out" of the definition of **Loss** is "the depreciation . . . in value of any investment product," as fully defined. As noted above, what follows "investment product" is a non-exclusive list of examples of "investment products"—"securities, commodities, currencies, options or futures." This is followed by two adjectival phrases, "due to market fluctuation" and "unrelated to any **Wrongful Act**." As I also noted above, I must assume that the *first* adjectival phrase, "due to market fluctuation," modifies "depreciation . . . in value of any investment product." The specific grammatical issue is, what does the *second* adjectival phrase, "unrelated to any **Wrongful Act**," modify?

More specifically, does "unrelated to any **Wrongful Act**" modify only "market fluctuation" (as Progressive contends), or does it, like the *first* adjectival phrase, modify only "depreciation . . . in value of any investment product" (as the FDIC-R contends)? To put it another way, the meanings attributed to this *second* adjectival phrase give the "investment loss carve-out" two possible meanings. The first meaning is that **Loss** does not include "depreciation . . . in value of any investment product," where the depreciation is "due to market fluctuation," and that "market fluctuation" is "unrelated to any **Wrongful Act**." The second meaning is that **Loss** does not include "depreciation . . . in value of any investment product," where the depreciation is "due to market fluctuation," and the "depreciation . . . in value of any investment" is *also* "unrelated to any **Wrongful Act**." Perhaps an expert grammarian could determine which meaning is required by strict adherence to the rules of grammar. Iowa law, however, requires that I "interpret the policy language from a reasonable rather than a hypertechnical viewpoint." *Boelman*, 826 N.W.2d at 501 (citing *Steel Prods. Co. v. Millers Nat'l Ins. Co.*, 209 N.W.2d 32, 36 (Iowa 1973)); *accord Holmes Murphy & Assocs., Inc.*, 831 N.W.2d at 134 ("We do not typically give [undefined terms] meanings only specialists or experts would understand."). From the required viewpoint, it appears to me to be just as reasonable to read both adjectival phrases as modifying "depreciation . . . in value of any investment product" as to read the second adjectival phrase as modifying the last noun of the first adjectival phrase.

Progressive argues that interpreting "unrelated to any **Wrongful Act**" as modifying "depreciation . . . in value of any investment product," not "market fluctuation," makes the "investment loss carve-out" a nullity. This is so, Progressive argues, because this reading means that the Vantus Policy would provide coverage for investment losses from "market fluctuation," thus making Progressive the guarantor of the Bank's investment decisions. Progressive argues that such an interpretation creates

a "moral hazard" that Bank directors and officers have no disincentive for bad investment choices, because they will know that the Vantus Policy will cover any investment losses. Progressive is correct that I must "not interpret an insurance policy to render any part superfluous," except in very limited circumstances, *see Boelman*, 826 N.W.2d at 501, but I do not find that an interpretation of the "investment loss carve-out" in which "unrelated to any **Wrongful Act**" modifies "depreciation . . . in value of any investment product" has such an unreasonable effect. Rather, even under this interpretation, there is still no coverage *unless* the "depreciation . . . in value of [the] investment product" is *related* to some **Wrongful Act**, and then only if an **Insured Person** is "legally obligated to pay" that **Loss** as the result of a **Claim** for that **Wrongful Act**. This conclusion follows from the interplay of the "investment loss carve-out," Vantus Policy, § IV(N)(6), Defendants' Joint Appendix II at 209, the definition of **Loss**, of which the "investment loss carve-out" is a part, *see id.* at § IV(N), Defendants' Joint Appendix II at 209, the definition of **Claim**, *id.* at § IV(C), Defendants' Joint Appendix II at 207, and the definition of **Wrongful Act**, *id.* at § IV(X), Defendants' Joint Appendix II at 210.

Consequently, I conclude that the "investment loss carve-out" "is susceptible to two *reasonable* interpretations." *Boelman*, 826 N.W.2d at 501 (emphasis in the original). The first interpretation is that **Loss** does not include "depreciation . . . in value of any investment product," where the depreciation is "due to market fluctuation," and that "market fluctuation" is "unrelated to any **Wrongful Act**." The second meaning is that **Loss** does not include "depreciation . . . in value of any investment product," where the depreciation is "due to market fluctuation," and the "depreciation . . . in value of any investment" is *also* "unrelated to any **Wrongful Act**." Because there are two such *reasonable* interpretations, the "investment loss carve-out" is "ambiguous." *Id.*

Yet, even if Progressive's reading of the "investment loss carve-out," in which "unrelated to any **Wrongful Act**" modifies "market fluctuation," were the *only*

reasonable one, the critical definitional problem would still exist. That definitional issue concerns the meaning of "unrelated" in the second adjectival phrase "unrelated to any **Wrongful Act**."

Progressive seeks to give the word "unrelated" a meaning comparable to the meaning of "due to"—that is, that there is no coverage pursuant to the "investment loss carve-out" if the **Wrongful Act** did not have a *causal* effect on the "market fluctuation."[16] Looking to dictionary definitions for the "ordinary" meaning of this undefined term," *Holmes Murphy & Assocs., Inc.*, 831 N.W.2d at 134, I find that the online version of the OED defines "unrelated," in the relevant sense, as "[h]aving no connection or common link; not standing in a relation to something." *See* http://www.oed.com ("unrelated," definition 2.); *and compare id.* (defining "related," in definition 2.a., as "[c]onnected or having relation to something else."). Certainly, the lack of a *causal* connection, for example, that a **Wrongful Act** did not *cause* the "market fluctuation," is one kind of lack of "connection," but it certainly is not the only *reasonable* one! Indeed, while I concluded, above, that the plain meaning of the phrase "due to market fluctuation" is that the "market fluctuation" must have a *causal* effect on the "depreciation . . . in value of [the] investment product," the choice of a *different* word, "unrelated"—instead of "not due to"—in the second adjectival phrase at least suggests an intent to describe a different kind of lack of connection. As the FDIC-R contends, "unrelated to" can be reasonably interpreted as broader than just "not causally connected to." Indeed, the FDIC-R argues that "unrelated to" is so vague as to be ambiguous. I do not agree with

---

[16] It appears that Progressive would apply this interpretation of "unrelated," even if the "unrelated to any **Wrongful Act**" modifies "depreciation . . . in value of any investment product"—that is, that there is no coverage pursuant to the "investment loss carve-out" if the **Wrongful Act** did not have a *causal* effect on the "depreciation . . . in value of [the] investment product."

the latter contention, because I conclude that "unrelated to any **Wrongful Act**" unambiguously means that the **Wrongful Act** must "hav[e] *no* connection," causal or otherwise, to the "market fluctuation." *See* http://www.oed.com (emphasis added) ("unrelated," definition 2.). Thus, if the **Wrongful Act** was somehow "related to"—that is, had *any kind* of connection to—the "market fluctuation," whether a cause-and-effect connection or some broader kind of connection, the "investment loss carve-out" does not apply. Moreover, nothing in the ordinary or dictionary definition of "unrelated" requires that the missing "connection" is limited to a one-way connection, such as one thing *causing* another.

Thus, as to the two critical interpretive issues concerning the "investment loss carve-out," I conclude, first, that there are two *reasonable* interpretations of what the second adjectival phrase—"unrelated to any **Wrongful Act**"—modifies. Consequently, the "investment loss carve-out" is ambiguous, and I must "adopt the construction most favorable to the insured." *Boelman*, 826 N.W.2d at 501-02. Second, even if the second adjectival phrase unambiguously modifies "market fluctuation," I conclude that "unrelated to any **Wrongful Act**" unambiguously means that the **Wrongful Act** must "have no connection," causal or otherwise, to the "market fluctuation."

### b. Construction

Next, I must decide the "construction"—that is, the "legal effect"—of the "investment loss carve-out," as I have interpreted it, which is a question of law for the court. *Id.* at 501. I recognize that, because of the ambiguity discovered above, I must construe the provision against Progressive and in favor of coverage for the FDIC-R's claims against the D&O Defendants. *Id.* Moreover, even assuming that there is no ambiguity in the "investment loss carve-out," and that Progressive's interpretation of what the second adjectival phrase modifies is plainly correct, it is appropriate to construe the "investment loss carve-out" narrowly, on the basis of the interpretation of the carve-

out as requiring that the "market fluctuation" have *no* connection to "any **Wrongful Act**," which undoubtedly limits the scope of the "investment loss carve-out" and broadens coverage under the Vantus Policy. Doing so is all the more appropriate, because what is at issue here is an exclusion from coverage in the insurance policy. An insurer, such as Progressive, "assumes a duty to define any limitations or exclusionary clauses in clear and explicit terms." *Id*. at 502 (internal quotation marks and citations omitted). Thus, I must "strictly construe" this exclusion against the insurer. *Id.*

The construction favorable to the D&O Defendants because of the ambiguity requires me to construe "unrelated to any **Wrongful Act**" as modifying "depreciation . . . in value of any investment product." Under this construction, the FDIC-R's claims allege sufficient "relation" of alleged **Wrongful Acts** to the "depreciation . . . in value of any investment product," even if they do not allege that "any **Wrongful Act**" *caused* that "depreciation," where "unrelated" must be broadly construed. The FDIC-R alleges that the D&O Defendants' **Wrongful Acts** included lack of reasonable diligence in deciding to purchase the securities in the first instance, failure to adequately manage risks, and noncompliance with OTS guidelines, which resulted in significant damage to the Bank when the securities depreciated. These allegations, if proved, would establish *some* "connection" between the **Wrongful Acts** and the "depreciation . . . in value" of the securities at issue, because it is the interrelationship or interplay of the alleged **Wrongful Acts** and the "depreciation" that ultimately caused the damage to the Bank. That is, there is the required "connection," where the alleged **Wrongful Acts** were purchasing and holding the securities in question, or too many of those securities, which were subject to such depreciation.

Yet, even if "unrelated to any **Wrongful Act**" unambiguously modifies "market fluctuation," the appropriate construction still requires coverage for the FDIC-R's claims against the D&O Defendants, in light of the interpretation of "unrelated to" as

unambiguously meaning "having no connection to." The FDIC-R's allegations, if proved, would establish *some* "connection" between the **Wrongful Acts** and the "market fluctuation" in the value of the securities at issue, even if the **Wrongful Acts** did not directly cause the "market fluctuation"—for example, by artificially manipulating the value of the securities for a time or actually causing the crash in the value of the securities. Again, it is the interrelationship or interplay of the alleged **Wrongful Acts** and the "market fluctuation" that ultimately caused the damage to the Bank, where the alleged **Wrongful Acts** were purchasing and holding the securities in question, or too many of those securities, which were subject to such "market fluctuation."

### 3.    Summary

As a matter of law, the "investment loss carve-out" does not bar coverage for the D&O Defendants for the FDIC-R's claims. Consequently, the FDIC-R and the D&O Defendants are entitled to summary judgment to that effect, and Progressive's Motion For Summary Judgment for a contrary declaration is denied.

### E.    The Effect Of The Dispositions Above On The D&O Defendants' Counterclaims

In its Motion For Summary Judgment, Progressive also asserts that resolution of the issues concerning the interpretation and construction of the "insured vs. insured exclusion" and the "investment loss carve-out," as well as other undisputed facts or matters of law, require summary judgment in its favor on the D&O Defendants' counterclaims. Because the resolution of the interpretation and construction issues concerning the exclusions on which Progressive relied are actually contrary to Progressive, I need only consider additional factual and legal arguments concerning the D&O Defendants' counterclaims. Although the parties have made separate arguments concerning summary judgment on each of the D&O Defendants' non-declaratory claims,

I find that, in light of my resolution of the declaratory issues above, I need not address separately the D&O Defendants' breach-of-contract claim and breach-of-implied-warranty claim.

### 1. *Arguments of the parties*

Progressive argues that, because it has not, in fact, failed to pay any **Claim** asserted by the FDIC-R, the D&O Defendants' counterclaims necessarily fail. Rather, Progressive argues that, as a matter of law, it has not breached the terms of the Vantus Policy and the covenant of good faith and fair dealing in that Policy nor has it breached the implied warranty in the Vantus Policy. Progressive argues that there is no dispute that it has not denied coverage for the FDIC-R's claim, but is proceeding pursuant to a reservation of rights. Indeed, Progressive points out that, pursuant to that reservation of rights, it has advanced substantial **Defense Costs** incurred by the D&O Defendants in the FDIC-R's lawsuit. Progressive argues that, until the FDIC-R obtains a judgment, Progressive is not even arguably obligated to pay anything other than **Defense Costs**. Progressive argues that the lack of factual and legal support for the D&O Defendants' breach-of-contract and breach-of-implied-warranty counterclaims requires summary judgment for Progressive on those counterclaims.

In addition, Progressive points out that the D&O Defendants' breach-of-implied warranty claim is based on the *lack* of coverage under the Vantus Policy and the consequent alleged unfitness of the Policy for the purpose for which the Policy was purchased. Progressive argues that there is no evidence to support the allegation that the D&O Defendants purchased the Policy for any *particular* purpose, however. Progressive argues that no reasonable person could have believed that the Policy provided coverage for any and all claims that might be asserted against the D&O Defendants for decisions or other actions taken in their capacities as directors and officers of the Bank. This is so, Progressive argues, because the Policy included a section labeled, in bold and all capital

letters, "**EXCLUSIONS APPLICABLE TO ALL INSURING AGREEMENTS.**" Progressive also argues that there is evidence that the D&O Defendants relied on Progressive's (as opposed to their insurance broker's) skill and knowledge in furnishing a policy suited to their particular purpose.

In response, the D&O Defendants contend that, not only should Progressive's Motion For Summary Judgment be denied as to their counterclaims, but that those claims are ripe for summary adjudication in their favor.[17] They contend that they are entitled to relief on their counterclaims (1) to the extent that coverage exists under the Policy, to the effect that any denial of payment of a **Loss** pursuant to the Policy is a breach of that contract, and (2) to the extent that coverage does *not* exist under the Policy, Progressive has breached its implied warranty with respect to coverage by selling a policy that effectively provides illusory coverage. The D&O Defendants argue that the only controversy that exists as to their breach-of-contract counterclaim is whether the Bank had a **Loss** that was covered by the Policy, but to the extent that the court rules that there is coverage, they are entitled to "an affirmative ruling finding coverage is warranted." D&O Defendants' Resistance To Plaintiff's Motion For Summary Judgment (docket no. 139), 12.

To the extent that there is no coverage under the Policy, the D&O Defendants argue that Progressive cannot avoid liability on their breach-of-implied-warranty counterclaim by arguing that the D&O Defendants could not have relied on representations by Progressive. They point out that a reasonable person would expect

---

[17] The D&O Defendants did not include in their Motion For Summary Judgment, which expressly addresses the declaratory judgment issues concerning coverage, any argument for summary judgment on their breach-of-contract counterclaim or their breach-of-implied-warranty claim, nor did they file a separate motion for summary judgment on their counterclaims.

that a policy entitled "**DIRECTORS & OFFICERS/COMPANY LIABILITY INSURANCE POLICY FOR FINANCIAL INSTITUTIONS**" would cover claims alleging liability for such directors. They contend that this is particularly true, where the Policy does not include a "regulatory exclusion," and Progressive provided other information about the Policy indicating that there would be coverage for claims typically excluded from coverage by a regulatory exclusion. They also argue that Holmes Murphy acted as *Progressive's* agent, so that representations by that broker are attributable to Progressive.

In reply, Progressive argues that, even if there is coverage under the Policy for the FDIC-R's claims against the D&O Defendants, it is still entitled to summary judgment on the D&O Defendants' breach-of-contract claim. Progressive contends that this is so, because the D&O Defendants have failed to offer any evidence establishing a breach of the Policy by Progressive, where (1) no final judgment on the FDIC-R's claims has been entered, and (2) Progressive has advanced the costs of defending the FDIC-R's action under a reservation of rights. Progressive argues that there is, as yet, no **Loss** resulting from a **Claim** against the D&O Defendants that the D&O Defendants are "legally obligated to pay." Progressive also argues that nothing bars Progressive from seeking a judicial determination of coverage before paying on a claim. Progressive also reiterates its arguments that it is entitled to summary judgment on the breach-of-implied-warranty claim.

### 2. *Analysis*

I find it useful to begin by summarizing the D&O Defendants' breach-of-contract and breach-of-implied-warranty claims. In their breach-of-contract claim, the D&O Defendants allege that Progressive's failure to pay claims asserted by the FDIC-R is a breach of the Policy and the implied covenant of good faith and fair dealing; that they have performed their obligations under the Policy; and that, as a direct and proximate

result of Progressive's breach of the Policy, they have suffered "damages," including costs associated with their efforts to effect Progressive's coverage, including reasonable attorneys' fees and costs. The D&O Defendants expressly pray for relief on this claim consisting of damages, interest on damages, costs and attorney's fees, and "such other and further relief as the Court deems just and proper." D&O Defendants' Answer And Counterclaim (docket no. 19), Counterclaim, Count I. In their breach-of-implied-warranty counterclaim, the D&O Defendants expressly allege, "To the extent there is no coverage under the Policy for the claims asserted by the FDIC[-R], the Policy was not fit for the purpose for which it was purchased." *Id.* at Counterclaim, Count II. The D&O Defendants pray for the same relief on this counterclaim as they seek on their breach-of-contract counterclaim. *Id.*

This summary of the claims suffices to demonstrate that *neither* counterclaim is, at least in the first instance, a "declaratory" claim, because the primary relief expressly requested on each counterclaim is damages. The D&O Defendants might argue that "an affirmative ruling finding coverage is warranted," as relief on their breach-of-contract counterclaim, because it falls within the "catchall" prayer for "such other and further relief as the Court deems just and proper" on that counterclaim, but they have not expressly done so. Moreover, such relief is entirely duplicative of the declaratory relief that they seek—and to which I have determined they are entitled—on their separate declaratory judgment counterclaim. Thus, I conclude that a declaration that "coverage is warranted" is not necessary or proper relief on the D&O Defendants' breach-of-contract counterclaim.

The D&O Defendants contend that the only controversy that exists as to the elements of their breach-of-contract counterclaim—as a claim for *damages*—is whether the Bank had a **Loss** that was covered by the Policy. Where there is no dispute that, despite its reservation of rights, Progressive has paid **Defense Costs** to defend the D&O

Defendants against the FDIC-R's claims, there has been no "breach" of the Policy until and unless there has been a refusal to pay a **Loss**. Also, there is or can be no dispute, under the plain language of the Vantus Policy, that there is no **Loss** until the D&O Defendants "are legally obligated to pay" any amount "resulting from a **Claim**." Vantus Policy, § IV(N), Defendants' Joint Appendix II at 209. Also, I cannot find that pursuing a declaratory claim concerning coverage under the Policy is, itself, a breach of the Policy, where the insurer has otherwise complied with its obligation to pay **Defense Costs**, albeit under a reservation of rights. The D&O Defendants have not cited any authority supporting the contention that such conduct is a breach of the Policy, and I have not found any such authority. More importantly, the Policy language cannot be reasonably interpreted as making such conduct a breach of the Policy.

In other words, the D&O Defendants have failed to generate any genuine issues of material fact on the "breach" element of their breach-of-contract counterclaim. *Torgerson*, 643 F.3d at 1042 (explaining that, in response, "[t]he nonmovant 'must do more than simply show that there is some metaphysical doubt as to the material facts,' and must come forward with 'specific facts showing that there is a genuine issue for trial.'" (quoting *Matsushita Elec. Indus. Co.*, 475 U.S. at 586–87)). Progressive is entitled to summary judgment on the D&O Defendants' breach-of-contract counterclaim. *Id.*; FED. R. CIV. P. 56.

I also find that the breach-of-implied-warranty counterclaim is expressly contingent on a declaration that there is no coverage under the Vantus Policy for the claims asserted by the FDIC-R against the D&O Defendants. In the disposition of the cross-motions for summary judgment on the coverage issues, however, I concluded that there is, as a matter of law, coverage for those claims. Thus, I conclude that the D&O Defendants' breach-of-implied-warranty counterclaim is moot as a matter of law, because the declarations on coverage that I find are required as a matter of law eliminate the

prerequisite for this counterclaim. Indeed, this counterclaim is plainly an "alternative" claim, and my disposition of coverage issues deprives the parties of any concrete or continuing interest in pursuing this counterclaim. *See, e.g., First Unioin Nat'l Bank ex rel. Southeast Timber Leasing Statutory Trust v. Pictet Overseas Trust Corp., Ltd.*, 351 F.3d 810, 816 (8th Cir. 2003) ("Mootness applies in cases in which one or both of the parties plainly lack a continuing interest, as when the parties have settled or a plaintiff pursuing a nonsurviving claim has died, [but] [a]s long as the parties have a concrete interest in the outcome of the litigation, the case is not moot notwithstanding the size of the dispute." (internal quotation marks and citations omitted)); *but see Outdoor Central, Inc. v. GreatLodge.com, Inc.*, 643 F.3d 1115, 1119 (8th Cir. 2011) (an alternative claim may not be moot, if it has not been abandoned in the event of a remand).

### 3.    *Summary*

In light of the disposition of the declaratory issues concerning coverage under the Policy, I find that the D&O Defendants' breach-of-implied-warranty counterclaim is moot as a matter of law, and that Progressive is entitled to summary judgment to that effect. I also find that the D&O Defendants have not generated a genuine issue of material fact on any breach of the Policy at issue, where Progressive has paid **Defense Costs**, albeit under a reservation of rights, and there is, as yet, no amount that the D&O Defendants are legally obligated to pay as the result of a covered **Claim**. Progressive is entitled to summary judgment on the D&O Defendants' breach-of-contract counterclaim.


## IV.    CONCLUSION

Upon the foregoing,

1.      Progressive's September 29, 2014, Motion To Strike And Exclude, In Part, The Affidavit Of Arlene Curry (Motion To Strike) (docket no. 145) is **denied** in its

entirety, and, consequently, I have properly consider Ms. Curry's affidavit, in its entirety, in my analysis of the parties' cross-motions for summary judgment;

2.      The parties' requests for oral arguments on their cross-motions for summary judgment, including the FDIC-R's separate Motion (docket no. 123) for such oral arguments, are **denied**;

3.      The FDIC-R's September 5, 2014, Motion For Summary Judgment (docket no. 118) is **granted** on Progressive's claims for declaratory judgment, and I declare that, as a matter of law, neither the "insured vs. insured exclusion" nor the "investment loss carve-out" in the Vantus Policy bars coverage for the claims of the FDIC-R against the D&O Defendants in the FDIC-R's separate lawsuit, *FDIC v. Dosland*, C 13-4046-MWB (N.D. Iowa);

4.      The D&O Defendants' September 5, 2014, Motion For Summary Judgment (docket no. 125) is **granted** as to Progressive's claims for declaratory relief and as to the D&O Defendants' declaratory claim in Count III of their Counterclaim, and I declare that, as a matter of law, neither the "insured vs. insured exclusion" nor the "investment loss carve-out" in the Vantus Policy bars coverage for the claims of the FDIC-R against the D&O Defendants in the FDIC-R's separate lawsuit, *FDIC v. Dosland*, C 13-4046-MWB (N.D. Iowa);

5.      Progressive's September 5, 2014, Motion For Summary Judgment (docket no. 120) is **granted in part and denied in part**, as follows:

   a.      Progressive's Motion is **denied** as to Progressive's claims for declaratory judgment and as to the D&O Defendants' declaratory claim in Count III of their Counterclaim as to Progressive's requests for declarations that the "insured vs. insured exclusion" and/or the "investment loss carve-out" in the Vantus Policy bar coverage for the claims of the FDIC-R against the D&O

Defendants in the FDIC-R's separate lawsuit, *FDIC v. Dosland*, C 13-4046-MWB (N.D. Iowa);

  b.  Progressive's Motion is **granted** as to the D&O Defendants' breach-of-contract claim in Count I of their Counterclaim; and

  c.  Progressive's Motion is **granted** as to the D&O Defendants' breach-of-implied-warranty claim in Count II of their Counterclaim on the ground that the claim is **moot**.

Furthermore, because this ruling disposes of all claims and counterclaims, judgment shall enter in accordance with the dispositions above.

  **IT IS SO ORDERED**.

  **DATED** this 23rd day of January, 2015.

_____
MARK W. BENNETT
U.S. DISTRICT COURT JUDGE
NORTHERN DISTRICT OF IOWA